OPINIONS OF THE SUPREME COURT OF OHIO
The full texts of the opinions of the Supreme Court of
Ohio are being transmitted electronically beginning May 27,
1992, pursuant to a pilot project implemented by Chief Justice
Thomas J. Moyer.
Please call any errors to the attention of the Reporter's
Office of the Supreme Court of Ohio.  Attention:  Walter S.
Kobalka, Reporter, or Deborah J. Barrett, Administrative
Assistant.  Tel.:  (614) 466-4961; in Ohio 1-800-826-9010.
Your comments on this pilot project are also welcome.
NOTE:  Corrections may be made by the Supreme Court to the
full texts of the opinions after they have been released
electronically to the public.  The reader is therefore advised
to check the bound volumes of Ohio St.3d published by West
Publishing Company for the final versions of these opinions.
The advance sheets to Ohio St.3d will also contain the volume
and page numbers where the opinions will be found in the bound
volumes of the Ohio Official Reports.

The State ex rel. Celebrezze, Atty. Gen., Appellee, v. National
Lime & Stone Company, Appellant.
[Cite as State ex rel. Celebrezze v. Natl. Lime & Stone Co.
(1994),    Ohio St.3d    .]
Environmental protection -- Air pollution control --
     Like-kind replacement of piece of equipment used in
     manufacturing operation involving emission of an air
     contaminant does not constitute "the installation of a new
     source of air pollutants" within the meaning of Ohio
     Adm.Code 3745-31-02(A).
                         ---
A like-kind replacement of a piece of equipment that is a
     component of a complex manufacturing operation involving
     the emission of an air contaminant does not constitute
     "the installation of a new source of air pollutants"
     within the meaning of Ohio Adm.Code 3745-31-02(A).
                         ---
     (No. 92-989 -- Submitted September 15, 1993 -- Decided
March 2, 1994.)
     Appeal from the Court of Appeals for Wyandot County, No.
16-91-7.
     Appellant, National Lime & Stone Company ("National"),
operates a limestone quarry and lime processing plant in Carey,
Ohio, and has done so since 1927.  At its Carey facility,
National produces, among other things, a product known as Type
N hydrated dolomitic quicklime ("hydrate").  Hydrate has many
uses, the majority of which involve environmental protection,
such as treatment of industrial wastes.
     The manufacture of hydrate begins with the extraction of
dolomitic limestone from the earth.  The extracted limestone is
crushed, screened and fed into Calcimatic kilns and burned at
extreme temperatures, resulting in dolomitic quicklime.  The
quicklime is then cooled with ambient air, further screened and
fed into a hydrator, where it is mixed with water to form
hydrate.
     The hydrate is then carried by way of elevator to a piece
of equipment known as a Raymond mill.  The function of the
Raymond mill is to grind the hydrate into a fine dust-like

material to meet customer specifications. During this process, air enters through the base of the Raymond mill, causing ground hydrate to be vented upward to a mechanism called a Whizzer classifier. The Whizzer classifier separates particles of hydrate, returning oversized particles to the Raymond mill for further reduction and discharging hydrate which meets certain specifications to a Cyclone collector. The Cyclone collector separates hydrate from the air and releases it into packer bins. Clean air is recirculated to the base of the Raymond mill.

The system including the Raymond mill and Cyclone collector has been stated to be a "closed-air" system. Most of the air involved in the milling procedure is recirculated and any excess air, which inevitably enters the system with the hydrate and which may collect a small amount of particulate matter, is vented through a baghouse. However, no air is vented directly from the Raymond mill to the baghouse. If air were vented directly from the mill to the baghouse it would cause the entire process to shut down. The baghouse is a filtration and pollution control device, filtering particulates from the air before the air is emitted from a stack into the atmosphere. The filtered hydrate that is collected in the baghouse is also conveyed to the packer bins. Hydrate from the packer bins is then either bagged or discharged by a pump into bins for loading onto trucks or rail cars.

In 1927, National installed two Raymond mills at its Carey plant, one known as the East mill and the other known as the West mill. In January 1974, a single permit to operate ("PTO") the two mills was granted by the Ohio Environmental Protection Agency ("OEPA"). In January 1986, the single PTO was split, providing a separate PTO for each mill. Sometime between 1986 and 1987, the East Raymond mill was taken out of service. In April 1987, due to its poor condition, the West Raymond mill was removed and replaced with a "like-kind" Raymond mill.

The replacement Raymond mill, which apparently occupies the same location in the plant as the prior West Raymond mill, cost approximately $350,000 to purchase and set up. The replacement mill differs from the prior mill only in that it has four rollers and a fifty-four-inch grinding ring, as compared to three rollers and a forty-two-inch grinding ring. The rollers and rings contribute to the actual grinding process.

The pollution control device (the baghouse) was installed in 1973. According to National, the baghouse constitutes the best available technology for particulates and has a design efficiency of more than ninety-nine percent. National also claims that plant personnel perform visible emissions checks on a daily basis to confirm that there are no visible emissions from the stack. On August 25, 1989, National's safety and environmental compliance officer, who was certified at the time, performed a Method 9 opacity test finding a zero percent opacity. See Part 60, Appendix A, Title 40, C.F.R.

Sometime in 1988, Donald E. Waltermeyer of OEPA's Northwest District Office, became aware of the replacement Raymond mill. Consequently, on September 28, 1988, the OEPA and National met to discuss permit requirements for the replacement mill. At this meeting, the OEPA informed National that a permit to install ("PTI") was required for the mill and

that a PTO was required for its continued operation. In December 1988, National sought to renew its existing PTO for the West Raymond mill. A PTO had been granted to National when the old mill was in operation and this permit was to expire in January 1989. By letter dated April 27, 1989, Waltermeyer reaffirmed the OEPA's position that a PTI was required for the replacement mill and that an application should be submitted no later than May 24, 1989. In this letter, Waltermeyer attached a memorandum from the OEPA's legal department, which concluded that the replacement mill was an "air contaminant source" and a "new source" of air pollutants within the meaning of applicable administrative rules.

On March 23, 1990, at the request of the OEPA, appellee, the Attorney General, filed a complaint against National for injunctive relief and civil penalties in the Court of Common Pleas of Wyandot County. Appellee alleged that National had violated Ohio Adm.Code 3745-31-02(A) and 3745-35-02(A) by failing to secure a PTI before installation of the replacement Raymond mill and by operating the mill without obtaining a PTO. Apparently, no action has been taken on National's application to renew its PTO pending resolution of this case.

National and appellee filed cross-motions for summary judgment. The trial court granted National's motion and denied appellee's motion, determining that a PTI was not required for the replacement Raymond mill. The trial court concluded that the administrative rules did not apply to replacement of an air contaminant source. The trial court also held that the existing PTO covered the Raymond mill and, further, ordered that appellee's complaint be dismissed with prejudice.

The court of appeals reversed the judgment of the trial court. Interpreting certain administrative rules differently than the trial court, the court of appeals held that National was required to obtain a PTI from the OEPA, since the replacement of the mill constituted an "installation of a new source of air pollutants" within the meaning of Ohio Adm.Code 3745-31-02(A).

The cause is now before this court pursuant to the allowance of a motion to certify the record.

Lee Fisher, Attorney General, David G. Cox and Timothy Kern, Assistant Attorneys General, for appellee.

Marshall & Melhorn, Thomas W. Palmer, Donald F. Melhorn, Jr. and Amy M. Natyshak, for appellant.

Vorys, Sater, Seymour & Pease, John W. Hoberg and Theodore A. Boggs, urging reversal for amici curiae, Ohio Aggregates Association, Ohio Chamber of Commerce and Ohio Manufacturers' Association.

Frost & Jacobs, Paul W. Casper, Jr. and K. Denise Grant, urging reversal for amicus curiae, Greater Cincinnati Chamber of Commerce.

Douglas, J.    The issue in this case is whether National acted contrary to law in replacing its West Raymond mill with a like-kind mill without obtaining a PTI from the OEPA. Resolution of this issue hinges on an interpretation of certain administrative rules promulgated by the Director of OEPA.

Former R.C. 3704.03(F)1 authorized the Director of OEPA to

"[a]dopt, modify, and repeal rules consistent with the purposes of this chapter prohibiting the location, installation, construction, or modification of any air contaminant source * * * unless an installation permit therefor has been obtained from the director or his authorized representative." (Emphasis added.) Am.Sub.H.B. No. 694, 139 Ohio Laws, Part II, 3460, 3740. Pursuant to this statutory authority, the director promulgated Ohio Adm.Code 3745-31-02(A), which provides that:

"[N]o person shall cause, permit, or allow the installation of a new source of air pollutants * * * or cause, permit, or allow the modification of an air contaminant source * * * without first obtaining a permit to install from the director. * * *" (Emphasis added.)

"Install" and "installation" are defined in Ohio Adm.Code 3745-31-01(I) as "to construct, erect, locate, or affix any air contaminant source or any treatment works." "Air contaminant source" means "each separate operation or activity that results or may result in the emission of any air contaminant." Ohio Adm.Code 3745-31-01(D). See, also, R.C. 3704.01(C). Particulate matter, such as dust, is within the definition of "air contaminant." Ohio Adm.Code 3745-31-01(C). See, also, R.C. 3704.01(B).

Ohio Adm.Code 3745-31-01(K) defines "new source" as "any air contaminant source * * * for which an owner or operator undertakes a continuing program of installation or modification or enters into a binding contractual obligation to undertake and complete, within a reasonable time, a continuing program of installation or modification, after January 1, 1974 * * *." (Emphasis added.)

Ohio Adm.Code Chapter 3745-31 sets forth PTI regulations which govern "new sources" of air pollution. In brief, the rules require that a PTI be obtained for any new source of air contaminants. Ohio Adm.Code 3745-31-02(A). The applicant must submit information about the new source to the OEPA, Ohio Adm.Code 3745-31-04, and, based on this information, the OEPA has discretion whether to grant or deny the permit, Ohio Adm.Code 3745-31-05. The process of conducting a new source review by the OEPA involves a potentially complicated, costly, and time-consuming procedure. As part of the review, the OEPA determines whether the proposed new source conforms to applicable state and federal air pollution laws, and whether the new source is the best available technology. Id.

Essentially, the requirement of a PTI, with respect to a new source review, can be triggered by the "installation" or "modification" of an air contaminant source that was installed or modified after January 1, 1974. For the most part, a "modification" does not occur unless there is a physical change or deviation in the method of operation of an air contaminant which increases emissions allowable under applicable law, or results in the release of a contaminant into the air that was not previously emitted. Ohio Adm.Code 3745-31-01(J). The precise focus in this case is not whether a "modification" has in fact occurred but, rather, whether the replacement of the Raymond mill in 1987 with a virtually identical mill constituted the "installation" of an air contaminant source, as that term is defined and set forth in relevant administrative rules.

Appellee asserts, and the court of appeals concluded, that the replacement Raymond mill was "installed," as defined in Ohio Adm.Code 3745-31-01(I), and, therefore, the mill constituted a "new source of air pollutants" within the meaning of Ohio Adm.Code 3745-31-02(A). National and amici curiae extensively challenge the appellee's and the court of appeals' interpretation of Ohio Adm.Code 3745-31-02(A) and they especially take issue with the contention that the replacement of the like-kind Raymond mill amounted to the "installation" of a "new source" of air contaminants. National asserts that "installation," as defined and used in the rules, does not include like-kind replacement of a piece of equipment which is a component of a complex manufacturing operation. National suggests that the OEPA should have focused on whether the replacement of the mill resulted in a "modification" of an air contaminant source as opposed to whether the replacement amounted to the "installation" of a new source of air contaminants.

In considering the parties' contentions, the trial court determined that Ohio Adm.Code 3745-31-02(A) does not govern the replacement of any air contaminant source but, rather, requires a PTI only for the installation of a new source of air contaminants or the modification of an air contaminant source. The trial court further concluded that the term "replacement" could easily have been included in the rules but, since it was not, the doctrine of expressio unius est exclusio alterius applies. We agree.

As set forth above, "install," as defined in the administrative rules, means to construct, erect, locate, or affix any air contaminant source. Ohio Adm.Code 3745-31-01 does not, however, provide a definition of the terms "construct," "erect," "locate" or "affix." According to Black's Law Dictionary (6 Ed.1990) 542, "erect" and "construct" are synonymous terms. "Construct" is defined as "[t]o build; put together; make ready for use * * * [and] is distinguishable from 'maintain,' which means to keep up, to keep from change, to preserve." Id., Black's at 312. Further, "construction" is defined as "* * * [t]he creation of something new, as distinguished from the repair or improvement of something already existing. * * *" (Emphasis added.) Id. See, also, United States v. Narragansett Improvement Co. (D.R.I. 1983), 571 F.Supp 688, 693 ("The uniform conclusion is that 'construction' imports the creation of something new and original that did not exist before."). In addition, the word "locate" means "* * * [t]o decide upon the place or direction to be occupied by something not yet in being * * *." (Emphasis added.) Black's at 939.

Literally construed, the word "installation," as defined in Ohio Adm.Code 3745-31-01(I) and used in Ohio Adm.Code 3745-31-02(A), connotes the establishment or formation of something that has yet to be in existence. The term, however, does not explicitly or implicitly refer to the replacement of a virtually identical (like-kind) component of a complicated manufacturing scheme.

In reaching our conclusion, we are conscious of the long-accepted principle that considerable deference should be accorded to an agency's interpretation of rules the agency is

required to administer. See State ex rel. Brown v. Dayton Malleable, Inc. (1982), 1 Ohio St.3d 151, 155, 1 OBR 185, 189, 438 N.E.2d 120, 123. See, also, Jones Metal Products Co. v. Walker (1972), 29 Ohio St.2d 173, 181, 58 O.O.2d 393, 398, 281 N.E.2d 1, 8. Further, this court has stated on previous occasions that an administrative rule that is issued pursuant to statutory authority has the force of law unless it is unreasonable or conflicts with a statute covering the same subject matter. Youngstown Sheet & Tube Co. v. Lindley (1988), 38 Ohio St.3d 232, 234, 527 N.E.2d 828, 830. Here, appellee interprets the word "installation" to embrace the replacement of a like-kind part of a rather complex manufacturing process, thereby requiring National to undergo the rigors of a new-source review. The interpretation of "installation" proposed by appellee is, in our opinion, unreasonable.

It is interesting to note that following the trial court's ruling the OEPA proposed that Ohio Adm.Code 3745-31-01(D) be amended to negate the interpretation reached by the trial court. Included in the appendix of National's brief is a letter from Donald E. Waltermeyer to Mary Cavin, hearing clerk for OEPA. In that letter, Waltermeyer submitted that the OEPA should, along with the proposed revision to Ohio Adm.Code 3745-31-01(D) incorporating the phrase "piece of equipment" within that rule, consider adding the words "'new or replacement' prior to 'air contaminant source' in the definition for 'Install.'" Waltermeyer noted that the language "new or replacement" would "eliminate any confusion that might exist," and that its inclusion would "clarify and solidify Ohio EPA's longstanding position in these situations." (Emphasis added.)

Appellee's interpretation of "installation" here is interesting in light of the requested revisions by the OEPA and Waltermeyer. If the definition of "installation" is as clear as appellee presently urges there would be no need for a clarification to "solidify" the OEPA's position. Further, to allow appellee to broadly interpret a rule that the OEPA has tacitly admitted is less than all-inclusive would be tantamount to unannounced rulemaking in violation of R.C. Chapter 119. See, generally, Brost v. Ohio State Med. Bd. (1991), 62 Ohio St.3d 218, 581 N.E.2d 515. See, also, R.C. 3704.04.

Appellee further implies that a decision that National was not required to obtain a PTI as a condition to replacing the Raymond mill diminishes the OEPA's authority to further the purposes of R.C. Chapter 3704. However, this implication lacks merit when one considers the broad discretionary powers conferred upon the OEPA by the General Assembly.

The broad range of powers given to the Director of OEPA by the General Assembly are delineated in R.C. 3704.03. In essence, the OEPA has been given authority to develop programs and implement standards for the prevention, control and abatement of air pollution consistent with the federal Clean Air Act, Section 7401 et seq., Title 42, U.S.Code. R.C. 3704.03(E); see, also, R.C. 3704.02(A)(2). In carrying out its responsibilities, the OEPA acts as a guardian of the law. More specifically, the OEPA can exercise its authority and designate a representative to inspect any facility (public or private), at any reasonable time, to ensure that the facility is in full

compliance with applicable law.  R.C. 3704.03(L).  Along with the discretion to inspect, the authorized representative can take samples, conduct tests and examine records or reports with respect to any emission of air contaminants.  Id.  Also, prior to the issuance of a PTI or renewal of a PTO, the OEPA can require the applicant "to install such equipment and conduct such tests and analyses as the director finds reasonable and necessary to determine adequately the amount and content of any emissions from such sources, the ambient air quality at the proposed site and in areas that may be affected by emissions from such sources, and any violation or potential violation of Chapter 3704. of the Revised Code or the regulations or orders promulgated thereunder."  R.C. 3704.031.  A person who violates any rule adopted by the OEPA is subject to prosecution.  R.C. 3704.06(A).  At the request of the OEPA, the Attorney General is required to file suit for injunctive relief, civil penalties or "any other appropriate proceeding" in a court of competent jurisdiction against any person violating or threatening to violate R.C. 3704.05.  R.C. 3704.06(B).  As a result, a court with jurisdiction can grant prohibitory or mandatory injunctive relief, and require the payment of a civil penalty up to $25,000 for each day of each violation.  R.C. 3704.06(B) and (C).

There is no question that Ohio's Air Pollution Control Law has some sharp teeth.  The OEPA has been provided with the authority and the means to effectuate the goals of Ohio's Air Pollution Control Law.

We are aware of and in complete agreement with the purposes of R.C. Chapter 3704, and commend the Director of OEPA for his efforts in promulgating rules to further protect and enhance the quality of air in this state.  Ohio's Air Pollution Control Law was enacted to allow the Director of OEPA to adopt rules and maintain standards for the prevention, control and abatement of air pollution consistent with the federal Act.  R.C. 3704.02(A)(2).  Of equal importance, R.C. Chapter 3704 was also established for the purpose of protecting and enhancing Ohio's air resources "so as to promote the public health, welfare, and economic vitality of the people of the state."  (Emphasis added.)  Former R.C. 3704.02(A)(1).  Am.Sub.S.B. No. 258, 138 Ohio Laws, Part I, 847, 849.  (The current version adds "productive capacity" to this list of things to be protected.)  To reflect this purpose, the General Assembly has repeatedly stated that actions required by the OEPA must not only be technically feasible but economically reasonable.  See, e.g., R.C. 3704.03(I) and (R).

As is evident, the General Assembly intended to strike a balance between the prevention, control and abatement of air pollution and excessive regulation or unwarranted interruption of a business to the point where it can no longer function competitively at a local, national or even worldwide level.  Obviously, the balance sought by the General Assembly can be lost if the quest for clean air is accompanied by excessive regulation.  Excessive regulation can disrupt vital functions of a business, threatening the company's very existence.  Similarly, exposing a business to regulations not explicitly covered by statute or rule could have an equally detrimental impact.  R.C. Chapter 3704 sets forth the role a business, as

an employer, plays in society.  Indeed, the goal for clean air should not, unless there is no other solution, lead to possible lost jobs or irrecoverable employment opportunities.

We also note that appellee, in concluding that the court of appeals' decision would not have a detrimental impact on businesses in this state, states that "[b]usinesses are not going to have to cease operations simply because they choose to repair or replace a piece of equipment.  Yet, they will have to plan ahead and submit an application for a PTI before they decide to replace an air contaminant source."  (Emphasis added.)  Appellee's comment ignores the realities in which some businesses must operate.  Granted, it would inure to a company's benefit if it could plan for all interruptions in the workplace.  Realistically, however, such a situation cannot exist under all circumstances.  Therefore, a balance between needed business regulation and needed business preservation must be struck.

We believe that absent a precise and reasonable directive from the General Assembly or a reasonable rule properly promulgated by the Director of OEPA on the subject, a business entity should not be forced to encounter the potential costs and delays associated with a PTI if a component of a manufacturing process becomes inoperable and the component is replaced with a like-kind piece of equipment.  Thus, we hold that a like-kind replacement of a piece of equipment that is a component of a complex manufacturing operation involving the emission of an air contaminant does not constitute "the installation of a new source of air pollutants" within the meaning of Ohio Adm.Code 3745-31-02(A).

Keeping in mind the purposes of R.C. Chapter 3704, we must strive to reach a balance between promoting and enhancing clean air and protecting and encouraging economic growth and opportunities for the people of this state.  This requires that business entities not be subjected to an interminable task of dealing with excessive regulation or requirements not explicitly covered by statute or rule.  Therefore, any uncertainty with regard to the interpretation of R.C. Chapter 3704 and rules promulgated thereunder should be construed in favor of the person or entity (manufacturer or otherwise) affected by the law.  Here, the mere replacement of the Raymond mill with a like-kind Raymond mill did not constitute the "installation" of a new source of air pollutants as that term is used in Ohio Adm.Code 3745-31-02(A).  If the General Assembly or the Director of OEPA wishes to bring "replacement" within the ambit of "installation," they must use the proper channels.

Accordingly, the judgment of the court of appeals is reversed.  The judgment of the trial court is reinstated.

Judgment reversed.

Moyer, C.J., Wright and Pfeifer, JJ., concur.

A.W. Sweeney, Resnick and F.E. Sweeney, JJ., dissent.


FOOTNOTE:
1    R.C. 3704.03(F) was amended, effective December 22, 1992, Sub.H.B. No. 359, and October 29, 1993, Am.Sub.S.B. No. 153.

Alice Robie Resnick, J.,  dissenting.  While I agree with the majority's assessment that the agency's interpretation

would produce some harsh results in this case, I do not believe

hat it is the function of this court to assay the wisdom of a policy choice made by the agency entrusted to make such a decision.

Ohio Adm. Code Chapter 3745-31 governs review of "new sources" of air pollution. Essentially, the regulations require a PTI, the issuance of which is preceeded by a new source review, to be obtained for any "new source" of air pollutants. Ohio Adm. Code 3745-31-02(A), 3745-31-04 and 3745-31-05. As relevant here, the regulations define "new source" to include "any air contaminant source *** for which an owner or operator undertakes a continuing program of installation *** after January 1, 1974 ***." (Emphasis added.) Ohio Adm. Code 3745-31-01(K). "Install" and "installation" are defined as "to construct, erect, locate, or affix any air contaminant source." Ohio Adm. Code 3745-31-01(I). "Air contaminant source" means "each separate operation or activity that results or may result in the emission of any air contaminant." Ohio Adm. Code 3745-31-01(D). See, also, R.C. 3704.01(C)

This case presents two questions: (1) whether the Raymond mill at National's limestone plant may be ranked as an "air contaminant source"; and, if so, (2) whether the term "installation" can be construed to encompass like-kind replacement. Although the majority's analysis is focused entirely on the issue of whether like-kind replacement constitutes an "installation," its ultimate holding inexplicably includes a factual determination that the Raymond mill at National's limestone plant is "a piece of equipment that is a component of a complex manufacturing operation." (Emphasis added.) The majority, therefore, makes a sub silentio finding that the Raymond mill does not rank as an "air contaminant source." It is necessary, therefore, to consider both prongs of the definition of "new source," i.e., "air contaminant source" and "installation."

## I. Standard of Review

Although the majority gives lip service to the "the long-accepted principle that considerable deference should be accorded to an agency's interpretation of rules the agency is required to administer," it does not pay homage to that principle.

The General Assembly has enacted in R.C. Chapter 3704 a technical and complex regulatory scheme to comply with the federal Clean Air Act, Section 7401 et seq., Title 42, U.S. Code, and to deal with the problems of air pollution that confront Ohio. It has entrusted the OEPA with the responsibility of administering the statute, and has delegated to it certain policy-making authority. In contrast, "[j]udges are not experts in the field, and are not part of either political branch of the Government." Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc. (1984), 467 U.S. 837, 865, 104 S.Ct. 2778, 2793, 81 L.Ed. 2d 694, 717. Thus, where the legislature "has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation. Rather, if the

statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." (Footnotes omitted).  Id. at 843, 104 S.Ct. at 2782, 81 L.Ed. 2d at 703.  This principle of deference has particular force where the agency interprets its own regulations.  Wisconsin Elec. Power Co. v. Reilly (C.A. 7, 1990), 893 F.2d 901, 907.

In determining whether the agency's interpretation is permissible under the statute, the United States Supreme Court in Chevron, supra, explained that:

"When a challenge to an agency construction of a statutory provision, fairly conceptualized, really centers on the wisdom of the agency's policy, rather than whether it is a reasonable choice within a gap left open by Congress, the challenge must fail.  In such a case, federal judges--who have no constituency-- have a duty to respect legitimate policy choices made by those who do.  The responsibilities for assessing the wisdom of such policy choices and resolving the struggle between competing views of the public interest are not judicial ones: 'Our Constitution vests such responsibilities in the political branches.' TVA v. Hill, 437 U.S. 153, 195 [98 S.Ct. 2279, 2302, 57 L.Ed.2d 117, 147] (1978)."  Chevron, 467 U.S. at 866, 104 S.Ct. at 2793, 81 L.Ed.2d at 717.

Instead of respecting these principles, the majority steadfastly violates them.  Concerned with the "sharp teeth" of Ohio's Air Pollution Control Act, the majority takes it upon itself "to reach a balance between promoting and enhancing clean air and protecting and encouraging economic growth."  In so doing, the majority, in direct contrast to every tenet of agency deference, actually proposes that "any uncertainty with regard to the interpretation of R.C. Chapter 3704 and rules promulgated thereunder should be construed in favor of the person or entity (manufacturer or otherwise) affected by the law," and that the balance should tip in favor of the business entity "absent a precise and reasonable directive from the General Assembly or a reasonable rule properly promulgated by the Director of OEPA on the subject."  As a result, the majority has turned the principle of agency deference on its head in order to substitute its policy choices for the policy choices made by the agency entrusted to make such choices.

## II.  Air Contaminant Source

Since the majority has failed to explain the basis of its finding that National's Raymond mill is "a piece of equipment that is a component of a complex manufacturing operation,"  it has left its reasoning to speculation.  The majority tells us neither why the Raymond mill itself falls short of being a "separate operation or activity," nor what the "complex manufacturing operation," of which the Raymond mill is a "component," consists of.  In any event, it is clear that it is permissible, both legally and factually, for the OEPA to rank the Raymond mill as an air contaminant source.

Prior to 1975, the United States Environmental Protection Agency ("EPA") ranked individual pieces of equipment, including mills, as a "stationary source" under the federal Clean Air Act.  See ASARCO, Inc. v. Environmental Protection Agency (C.A.D.C. 1978), 578 F.2d 319, 322-323.  See, also, Butler, New Source Netting in Nonattainment Areas Under the Clean Air Act

(1984), 11 Ecology L.Q. 343, at 349, 353.  Between 1975 and 1981, the EPA introduced successive plantwide definitions of "stationary source" into its various regulations governing the programs set forth in Parts A, C and D of the federal Clean Air Act.  Id. at 350, fn. 67; Chevron, supra, 467 U.S. at 853-857, 104 S.Ct. at 2787-2789, 81 L.Ed.2d at 709-712.

The EPA now gives the states the option of adopting the following plantwide definition of "stationary source" in their state implementation plans:

"Stationary source means any building, structure, facility, or installation which emits or may emit any air pollutant subject to regulation under the Act.

"Building, structure, facility, or installation means all of the pollutant-emitting activities which belong to the same industrial grouping, are located on one or more contiguous or adjacent properties, and are under the control of the same person (or persons under common control) ***."  Sections 51.165(a)(1)(i) and (ii) (Part D permit requirements for state implementation plans), and 51.166(b)(5) and (6), Title 40, C.F.R.

The EPA, however, continues to approve state implementation plans that deviate from the plantwide definition if the state "specifically demonstrates that the submitted definition is more stringent, or at least as stringent, in all respects."  Sections 51.165(a)(1) and 51.166(b), Title 40, C.F.R.  See, also, Section 7416, Title 42, U.S. Code.

In clear contrast to the EPA-authorized plantwide definition of "stationary source" as a combination of "all of the pollutant-emitting activities which belong to the same industrial grouping," the General Assembly and the OEPA have chosen to define an "air contaminant source" as "each separate operation or activity."  (Emphasis added.)  R.C. 3704.1(C); Ohio Adm. Code 3745-31-01(D).  In turn, the OEPA has consistently interpreted R.C. 3704.01(C) and Ohio Adm. Code 3745-31-01(D) to allow for the ranking of individual pieces of equipment as sources of air pollution subject to PTI review.[2]

Rather than precluding regulation at the level of equipment, the definition of "air contaminant source" set forth in R.C. 3704.01(C) and Ohio Adm. Code 3745-31-01(D) gives flexibility to the OEPA to regulate at different levels.  Nothing in these definitions prevents a factual determination that the smaller process of grinding, rather than the larger process of hydrate production, constitutes a "separate operation or activity," or that the operation or activity of grinding could factually consist entirely of a single piece of equipment such as the Raymond mill.

In fact, the PTI regulations compel the conclusion that there are times when an operation or activity will consist entirely of a single piece of equipment.  Ohio Adm. Code 3745-31-03(A)(1) contains a laundry list of new air contaminant sources that are exempted from a PTI review.  Many of the sources in this list are specifically identified as equipment.  By negative implication, this listing evinces an intent to allow individual pieces of equipment to be ranked as air contaminant sources if not excepted.  If the definition of "air contaminant source" precluded the ranking of equipment as a source, there would be no need to exempt certain specific types

of equipment.

Clearly, it is improper for this court to find as a matter of law that the only operation or activity taking place at National's limestone plant is the entire "complex manufacturing operation." To do so is to incorporate into the statute and regulation the very plantwide definition of "air contaminant source" that the General Assembly and the OEPA chose not to adopt. Further, the record in this case clearly reveals sufficient facts to support the finding made by the OEPA that the operation or activity of grinding at National's plant is a separate operation or activity consisting entirely of the Raymond mill. The production of hydrate begins with the extraction of dolomitic limestone from the earth through the use of explosives. The extracted limestone is crushed and screened, then burned in kilns at approximately 2,300 degrees Fahrenheit. The result is dolomitic quicklime. When the quicklime cools, it is screened and fed into a hydrator, where it is mixed with water to form hydrate. The hydrate is then fed into the Raymond mill, where it is ground into finer material in accordance with customer specifications. It is at this point in production that the air-polluting particles at issue in this case are generated. The only reason that these particles are not released at the site of the mill is that they are trapped, along with the rest of the hydrate, in an air stream that circulates through an essentially closed-air system, and are routed to a baghouse where they are filtered out before the air is emitted into the atmosphere.

Certainly, under these facts the OEPA can determine that the Raymond mill is an air contaminant source. It is the Raymond mill by itself that generates the particulate matter that is sought to be regulated. The routing of the particulate matter that the mill generates does not vitiate the status of the mill as a source of air pollutants any more than the rerouting of exhausts from an automobile would change its status as a source of air pollutants.

### III. Like-Kind Replacement Versus Installation

The majority concludes that "[t]he interpretation of 'installation' [as including 'replacement'] proposed by appellee is, in our opinion, unreasonable." In reaching its conclusion, the majority selectively extrapolates dictionary definitions of the terms "construct," "construction" and "locate" to illustrate that "[l]iterally construed, the word 'installation,' as defined in Ohio Adm. Code 3745-31-01(I) and used in Ohio Adm. Code 3745-341-02(A), connotes the establishment or formation of something that has yet to be in existence." (Emphasis sic.)

As the majority points out, the terms "construct" and "construction" mean the creation of something new, as distinguished from the repair or improvement of something already existing. See Websters' Ninth New Collegiate Dictionary (1983) 281; Black's Law Dictionary (6 Ed. 1990) 312. This, however, does not disclose whether the replacement of an entire air contaminant source is to be considered a mere repair or improvement, or whether it is to be considered as the creation of something new. Depending upon the statutory or contractual context of their use, the terms "construct" and "construction" can mean "replacement" as opposed to repair or

improvement; and the terms "replace" and "replacement" can mean the comparable exchange of something new for something old or worn out, as opposed to the maintenance or repair of something existing. See 8A Words and Phrases (1951) 470; 37 Words and Phrases (1950) 11; Webster's Ninth New Collegiate Dictionary, supra, at 999.

It would indeed be an interesting display of linguistic gymnastics were a member of the majority to attempt to convince the carpet salesperson, who replaced his worn-out carpet with like-kind carpet, that installation charges are unwarranted because the word "'installation' connotes the establishment or formation of something that has yet to be in existence."

Clearly, the use of such common, ordinary meanings is woefully inadequate to decisively classify replacement sources of air pollution as falling outside the definition of "installation." The majority's conclusion, resting as it does on such a precarious foundation, is unstable at best.

One of the stated purposes of Ohio's Air Pollution Control Act is to enable the state, through the Director of Environmental Protection, to develop a program that is consistent with the federal Clean Air Act. R.C. 3704.02(A)(2) and 3704.01(K) (formerly [H]). In addition, former R.C. 3704.02(B) provided, in pertinent part, that:

"The provisions of Chapter 3704. of the Revised Code, all regulations adopted pursuant to Chapter 3704. of the Revised Code, and all permits *** shall, to the extent reasonably possible, be construed to be consistent with the federal Clean Air Act***." Am.Sub.S.B. No. 258, 138 Ohio Laws, Part I, 847, 849.

The federal Clean Air Act embodies a construction/modification dichotomy similar to the OEPA's installation/modification dichotomy set forth at Ohio Adm. Code Chapter 3745-31. As relevant here, the Clean Air Act provides for various sets of requirements applicable to newly constructed or modified stationary sources of air pollution.

Like Ohio's regulations, the federal Act makes its permitting provisions applicable to new sources of air pollution. Sections 7410(A)(2)(D), (2)(I) and (4), Title 42, U.S. Code.3 Similar to Ohio Adm. Code Chapter 3745-31, the federal Act defines the term "new source" as including "construction or modification," and defines "modification" as any change "which increases the amount of any air pollutant emitted by such source or which results in the emission of any air pollutant not previously emitted." Section 7411(a)(2) and (4), Title 42, U.S. Code.

In enacting the Clean Air Act, particularly the Clean Air Act Amendments of 1977, Pub. L. 95-95, 91 Stat. 685, Congress had fully considered the proper political "balance between promoting and enhancing clean air and protecting and encouraging economic growth" which the majority of this court has taken upon itself to reconsider. The House Committee Report succinctly specifies that the section of the Act governing nonattainment areas seeks "the dual goals of attaining air quality standards and providing for new economic growth." H.R. Rep. No. 95-294, 2 U.S. Code Cong. & Adm. News (1977) 1077, 1091. The report goes on to explain that:

"In revising its plan to permit new growth, the *** State

plan *** must require permits for the construction and operation of new or modified major sources. Additionally, the owner or operator of a prospective new source (or modification) must demonstrate that all sources owned by him *** are in compliance or on a schedule for compliance. The source must also demonstrate that the issuance of a permit will not cause or contribute to concentrations of any air pollutant, for which national ambient air quality standards have not been promulgated, which would pose a significant risk to health." Id.

The portion of the Senate Committee Report dealing with nonattainment areas explains further that:

"A major weakness in implementation of the 1970 Act [Clean Air Amendments of 1970, Pub. L. 91-604, 84 Stat. 1676] has been the failure to assess the impact of emissions from new sources of pollution on State plans to attain air quality standards by statutory deadlines. States have permitted growth on the assumption that a deadline was sufficiently distant so that future emissions reductions could be made to compensate for the initial increase. It can now be seen that these assumptions were wrong. Some mechanism is needed to assure that before new or expanded facilities are permitted, a State demonstrate that these facilities can be accommodated within its overall plan to provide for attainment of air quality standards." S. Rep. No. 95-127 (1977) 55.

With these considerations in mind, Senator Muskie made the following poignant remarks in submitting the Conference Committee Report:

"I should note that the test for determining whether a new or modified source is subject to the EPA interpretative regulation--and to the permit requirements of the revised implementation plans under the conference bill--is whether the source will emit a pollutant into an area which is exceeding a national ambient air quality standard for the pollutant--or precursor. Thus, a new source is still subject to such requirements as 'lowest achievable emission rate' even if it is constructed as a replacement for an older facility resulting in a net reduction from previous emission levels.

"A source--including an existing facility ordered to convert to coal--is subject to all the nonattainment requirements as a modified source if it makes any physical change which increases the amount of any air pollutant for which the standards in the area are exceeded." (Emphasis added.) 123 Cong. Rec. (1977) 26847.

In light of the foregoing legislative history of the Clean Air Act, it is obvious that, after giving thoughtful consideration to the competing interests of clean air and economic growth, Congress intended for replacement sources to be governed by the regulations applicable to newly constructed sources.

The majority, in an effort to bolster its position, states that "[i]t is interesting to note that following the trial court's ruling the OEPA proposed that Ohio Adm. Code 3745-31-01(D) be amended to negate the interpretation reached by the trial court" and that a letter by Donald E. Waltermeyer, an OEPA employee, proposed a further change of "adding the words '"new or replacement" prior to "air contaminant source"

in the definition for "Install."'"  The majority deduces therefrom that "[i]f the definition of 'installation' is as clear as appellee presently urges, there would be no need for a clarification to 'solidify' the OEPA's position."

I cannot accept the majority's view of the reasons behind the proposed amendment.  The agency's amendment "to negate the interpretation reached by the trial court" is just that.  The need for "clarification to 'solidify' the OEPA's position" was not the result of anything the agency had done, but a result of what the trial court had done.  The majority's treatment of the proposed amendment as tantamount to a judicial admission ignores the very letter by Waltermeyer proposing the amendment.  That letter specifically explains that:

"The Ohio EPA, Division of Air Pollution Control, has always considered the act of replacing an existing air contaminant source as being one that requires a Permit to Install.  This has always been Ohio EPA's interpretation of the rules, even when the new equipment is identical to the equipment being replaced."

Based on the foregoing, I would find the OEPA's interpretation to be a permissible one and affirm the decision of the court of appeals.

A.W. Sweeney and F.E. Sweeney, JJ., concur in trhe foregoing dissenting opinion.

Footnotes:
2     In his uncontroverted affidavit, Robert F. Hodanbosi, Manager of the Air Quality Modeling and Planning Section of the Division of Air Pollution Control in the OEPA, states:

"I have consistently determined, since I began my current duties as Manager in the Division of Air Pollution Control in 1978, that sources like the 'new' Raymond Mill *** are new sources *** which must obtain permits to install, as required by O.A.C. Rule 3745-31-02."

In addition, a review of the Ohio EPA Weekly Review from April 1973 to the present reveals that for the last twenty years, the OEPA has applied its various definitions broadly to include individual pieces of equipment as subject to the PTI requirements.
3     After the replacement of the Raymond mill, Congress enacted the Clean Air Act Amendments of 1990, effective November 15, 1990.  See Pub. L. 101-549, Title VII, Section 711(b), November 15, 1990, 104 Stat. 2399, 2684.  The 1990 amendments made no substantive changes that are relevant to the case sub judice.  All citations in this dissenting opinion are to the Clean Air Act prior to the 1990 amendments.