OPINION
This matter is a consolidated administrative appeal filed by the City of Perrysburg ("Perrysburg") from a November 9, 2000 order of the Environmental Review Appeals Commission ("ERAC"). Perrysburg sets forth the following four assignments of error:
 I. THE COMMISSION'S RULING THAT THE WATERLINE PLAN APPROVALS DID NOT VIOLATE O.A.C. § 3745-91-02(D) WAS NOT SUPPORTED BY RELIABLE, PROBATIVE AND SUBSTANTIAL EVIDENCE NOR IN ACCORDANCE WITH LAW.
 II. THE COMMISSION'S RULINGS THAT THE WATERLINE PLAN APPROVALS COMPLIED WITH O.A.C. § 3745.91-06(C) AND THAT THE DISTRICT HAD SUFFICIENT WATER CAPACITY WERE NOT SUPPORTED BY RELIABLE, PROBATIVE AND SUBSTANTIAL EVIDENCE NOR IN ACCORDANCE WITH LAW.
 III. THE COMMISSION'S FAILURE TO RULE THAT THE SADDLEBROOK PLAN APPROVAL APPLICATIONS WERE NOT "PROPER APPLICATIONS" UNDER O.R.C. § 6109.07(A)(1) PROCESSED IN VIOLATION OF O.A.C. § 3745-91-08(B) WAS NOT SUPPORTED BY RELIABLE, PROBATIVE AND SUBSTANTIAL EVIDENCE NOR IN ACCORDANCE WITH LAW.
 IV. THE COMMISSION'S FINDING THAT THE DISTRICT WAS "DULY AUTHORIZED" TO PROVIDE WATER SERVICE TO SADDLEBROOK WAS IMPROPER, NOT SUPPORTED BY RELIABLE, PROBATIVE AND SUBSTANTIAL EVIDENCE AND NOT IN ACCORDANCE WITH LAW.
These appeals involve the Ohio Environmental Protection Agency's ("OEPA") approval of two waterline extensions into the Saddlebrook subdivision located in Middleton Township, Wood County, Ohio. The Saddlebrook subdivision is located within the Wood County Regional Water and Sewer District ("the District"). Directly to the north of Saddlebrook is Roachton Road and Perrysburg. Although no part of Saddlebrook lies within the city limits of Perrysburg, a water main which carries water supplied by the city of Toledo to Perrysburg runs east and west along Roachton Road. The city of Bowling Green, which supplies water to the District, is located to the south and west of Saddlebrook. Another water main, carrying water provided by Bowling Green to the District, runs along Hull Prarie Road, directly to the east of Saddlebrook. The two waterline extensions connecting Saddlebrook to the District's Prarie Road main are at issue in this case.
Plans for the construction of water service to Saddlebrook began in 1996 when Saddlebrook Development Company began negotiating with both Perrysburg, as well as the District, for water service. Saddlebrook eventually chose to enter into an agreement with the District, and the District extended its water main along Hull Road in order to serve the residents of Saddlebrook. Thereafter, Saddlebrook Development Company submitted two applications for waterline taps to connect Saddlebrook with the Hull Road main.
The first application, waterline 390, was designed to serve single family homes within the Saddlebrook subdivision, while waterline 390A was dedicated to serve condominiums. The extension of waterline 390 was approved by the OEPA on July 31, 1997, and the extension of 390A on December 10, 1997. Perrysburg contested the approval of both extensions, and its appeals were consolidated for a de novo hearing before the ERAC. Following a six-day hearing, the ERAC issued an order which affirmed the OEPA's decision to approve Saddlebrook's applications.
Appeals from orders of the ERAC are governed by R.C. 3745.06, which provides as follows:
 Any party adversely affected by an order of the environmental review appeals commission may appeal to the court of appeals of Franklin county, or, if the appeal arises from an alleged violation of a law or regulation, to the court of appeals of the district in which the violation was alleged to have occurred. * * *
* * *
 The court shall affirm the order complained of in the appeal if it finds, upon consideration of the entire record and such additional evidence as the court has admitted, that the order is supported by reliable, probative, and substantial evidence and is in accordance with law. In the absence of such a finding, it shall reverse, vacate, or modify the order or make such other ruling as is supported by reliable, probative and substantial evidence and is in accordance with law. * * *
Reliable evidence is evidence which can be trusted. In order for evidence to be reliable, there must be a reasonable probability that it is true. Probative evidence is evidence which tends to prove the issue in question, while substantial evidence is evidence which carries weight, or evidence which has importance and value. Our Place, Inc. v. Ohio Liquor Control Comm. (1992), 63 Ohio St.3d 570, 571.
In order to determine whether an administrative order is supported by reliable, probative, and substantial evidence, we must weigh and evaluate the credibility of the evidence presented to the ERAC. Univ. of Cincinnati v. Conrad (1980), 63 Ohio St.2d 108 . In Andrews v. Bd. of Liquor Control (1955), 164 Ohio St. 275, the Ohio Supreme Court acknowledged that determining whether an agency order is properly supported is essentially a question of the absence or presence of the requisite quantum of evidence. The court continued noting that this inevitably involves a consideration of the evidence and, to a limited extent, would permit a substitution of judgment by the reviewing court.
However, the General Assembly created administrative bodies to facilitate certain areas of the law by placing the administration of those areas before boards or commissions composed of individuals who possess special expertise. See Pons v. Ohio State Med. Bd. (1993),66 Ohio St.3d 619, paragraph one of the syllabus. Accordingly, the courts should give due deference to the administrative interpretation of rules and regulations, as well as the administrative resolution of evidentiary conflicts, as the administrative body has the best opportunity to observe the demeanor of the witnesses in order to assess their credibility. See Univ. of Cincinnati, supra.
In its first assignment of error, Perrysburg claims that the OEPA acted unlawfully when it approved Saddlebrook's applications without first conditionally approving a "master plan" commissioned by the District in 1993. This argument is premised upon Ohio Adm. Code 3745-91-02(D), which provides:
 If a general plan, containing preliminary information concerning proposed source, treatment, and distribution has been prepared, it shall be submitted in three copies and shall have received conditional approval prior to submittal of an application under this rule.
According to Perrysburg, the District's 1993 master plan is, in fact, a general plan for purposes of Ohio Adm. Code 3745-91-02(D). However, because neither "master" nor "general" plans are statutorily or administratively defined, we, as the ERAC, are left to determine the meaning of these words from the testimony and record below. In doing so, we give appropriate deference to the OEPA and ERAC's conclusions on this matter.
As noted, both the OEPA and the ERAC determined that the District's 1993 master plan is not a general plan for purposes of Ohio Adm. Code3745-91-02(D). Having reviewed the record, we find this conclusion to be supported by reliable, probative, and substantial evidence.
Dr. Ashley Bird testified before the ERAC on October 28, 1999. At that time, Dr. Bird had been employed by the OEPA for almost eighteen years, and as the manager of the OEPA Engineering and Operations Section for approximately fourteen years. (Tr. 1011.)
After being questioned regarding his extensive education and professional experience, Dr. Bird explained that the OEPA Engineering and Operations Section is responsible for the design and operation of the water treatment infrastructure throughout the state. During his tenure, Dr. Bird examined hundreds of general plans and has been personally involved in ensuring compliance with, and the drafting and modification of rules and regulations regarding the provision of safe drinking water throughout the state. (Tr. 1016-1031.)
According to Dr. Bird, a general plan contains information on water supply treatment and distribution. It is a preliminary document that sets forth an open-ended design basis for proposed facilities prior to the preparation of detailed design plans. In his own words, Dr. Bird stated that the purpose of a general plan is:
 * * * [T]o outline the general concepts behind the design of the proposed facilities so the owner and, if they're submitted to the [OEPA], so the [OEPA] can review the proposed design at an early stage and suggest any — any appropriate changes in it before a lot of time and money is invested in preparing detailed plans for those facilities. [Tr. 1035.]
As he was questioned further, Dr. Bird went into greater detail explaining that general plans relate to specific projects or technologies. A general plan sets forth the initial concept on how facilities are going to be put together and includes details of the proposed technology which is going to be used, information on capacities, materials, and locations on projects which are under development. These plans, if prepared, are then submitted to the OEPA so that it may suggest any necessary alterations to projects under development. In his opinion, the master plan submitted by the District was not a "general" plan. (Tr. 1035-1036.)
Thomas Stalter, a civil engineer and vice president of the Pogemeier Design Group, also testified before the ERAC. Stalter testified that the 1993 master plan submitted by the District to the OEPA for comment was, in fact, prepared by the Pogemeier Design Group. (Tr. 731.) According to Stalter, the District's 1993 Master Plan is a conceptual plan only, and does not contain any specific information regarding the source, service, treatment facilities, or distribution lines within the District. (Tr. 722-736.) According to Stalter:
 A master plan is really put together more as a reference manual to discuss things such as population, land use, potential areas, service providers, potential ways to serve the areas * * *
 A general plan is a much more specific document. It is put together when you need to study service for a particular area or a particular type of treatment or a particular usage. I feel that it's a very clear difference in that a general plan, you put together when you're actually trying to generate a project.
 When you — when you find an area that needs service and you're not sure how to do it, that's when you prepare that general plan. * * * [Tr. 736.]
Dr. Bird echoed this difference when he explained that the District's 1993 master plan does not propose any specific waterlines, nor specific quantities from named, known or proposed sources. In his words, "the information provided is certainly inadequate to proceed to the design of any particular project * * *." (Tr. 1112.)
In this case, we have carefully examined the evidence and testimony of each witness, paying particular attention to the portions of the record cited by Perrysburg. However, in our view, Perrysburg's citations to the record form a weak foundation upon which to base its claim that the District's 1993 master plan was, in fact, a general plan pursuant to Ohio Adm. Code 3745-91-02(D) for the construction of waterline extensions 390 and 390A.
The testimony of Bird and Stalter, in addition to the testimony of the remaining witnesses, constitutes reliable, probative, and substantial evidence that the District's 1993 master plan is not a general plan. In so finding, we expressly reject appellant's contention that the District was required to obtain conditional approval of its master plan prior to the submission of Saddlebrook's applications over three years later. We also reject appellant's claim that the District impermissibly circumvented Ohio Adm. Code 3745-91-02(D) by submitting applications in Saddlebrook's name. This factual dispute was properly settled by the ERAC, and we are cognizant of the well-settled principle that "considerable deference should be accorded to an agency's interpretation of rules the agency is required to administer." State ex rel. Celebrezze v. Nat'l. Lime Stone Co. (1994), 68 Ohio St.3d 377, 383. Accordingly, appellant's first assignment of error is overruled.
In its second assignment of error, Perrysburg argues that there is insufficient evidence to support the ERAC's finding that the waterline approvals complied with Ohio Adm. Code 3745-91-06. Specifically, appellant contends that Saddlebrook's applications omitted "information as to the capacity and long-term adequacy of the source of supply." Ohio Adm. Code3745-91-06(C). In its entirety, that rule provides that the following information shall be submitted in connection with an application for approval of plans:
The following supporting information shall be submitted:
 (A) An explanation of the project and its basis of design, and such other information relevant to approval of plans that may not be fully evident from the plan drawings and specifications. Information required by this rule may vary depending upon the type and complexity of the project under review.
 (B) A copy of the results of chemical, bacteriological, radiological, or other analyses performed on the raw or finished water;
 (C) Information as to the capacity and long-term adequacy of the source of supply;
 (D) If the water system will depend in whole or part upon a new well as a source of water the following additional materials shall be submitted:
 (1) A well site acceptance letter signed by a representative of the district office indicating that the site of the well is capable of providing isolation acceptable to the district office.
 (2) A copy of a deed, easement, or other legal instrument showing that the owner has control of lands sufficient to provide isolation as approved in the well site acceptance letter.
 (3) A copy of the log of the well, and a copy of the results of the pumping tests performed on the well. Test pumping and sampling for chemical and radiological analyses are required unless waived by the director.
In this case, Perrysburg seizes upon two questions on the water supply data sheets filled out by Saddlebrook as part of its 390 and 390A waterline extension applications. The data sheets are forms created by the OEPA which solicit information such as the title and location of the proposed project, identification of the owner, and the estimated construction cost.
Perrysburg argues for a strict, literal reading of Ohio Adm. Code3745-91-06(C). In bold, italic type, appellant argues that applicants shall and must provide all of the information called for on the OEPA data sheet, including the rate of water production in gallons per minute and capacity figures for the source of supply. Because these two portions of Saddlebrook's applications were left blank, Perrysburg argues that the OEPA was not permitted to grant the applications. However, appellant's belief that Ohio Adm. Code 3745-91-06 must be strictly applied is clearly contradicted by the rule itself which provides that the "information required by this rule may vary depending upon the type and complexity of the project under review." Ohio Adm. Code 3745-91-06(A).
As set forth in the record of the ERAC proceeding, several witnesses testified that the water supply data sheets are used for a number of different types of applications. As such, questions requesting information as to water production or the supply source for water may be pertinent to the construction of a water treatment plant, but not to the construction of a water supply line. (See Tr. 428-434; 860-880; and 1045-1056.) Moreover, the OEPA does not interpret Ohio Adm. Code 3745-91-06
to require strict compliance, but as a starting point for information about a project. For example, in this case the OEPA reviewing officers knew the supply source for this particular waterline, as well as the production and capacity of the source. (Tr. 748-754; 883; 942; 1053-1066; 1070.) Appellant's position simply ignores the fact that the OEPA is an active participant in reviewing, collaborating, and approving project applications, rather than a mere "gate keeper." Our review leads to the conclusion that this interpretation is entitled to appropriate deference. See State ex rel. Brown v. Dayton Malleable, Inc. (1982),1 Ohio St.3d 151, and Jones Metal Products Co. v. Walker (1972),29 Ohio St.2d 173.
Finally, we also find sufficient reliable, probative, and substantial evidence to support the conclusion that the District has ample water capacity to supply the Saddlebrook subdivision. First, because it has been doing so for at least the last three years, and second, because the evidence showed that the District supplies the Saddlebrook subdivision under a contract with the Bowling Green treatment plant which has no supply limit. (Tr. 517-533; 749-754; 1053-1066; 1070; 1148-1149.) Therefore, appellant's second assignment of error is overruled.
In its third assignment of error, appellant re-casts its argument that Saddlebrook's applications were incomplete because the data sheets submitted with those applications failed to contain information on capacity and source of supply. However, as set forth above, at least three OEPA officials responsible for plan approvals testified that Saddlebrook's applications were complete. Moreover, three engineers, two for the District, and one for Saddlebrook, also testified that the applications were complete. For the reasons set forth above, this contention is not well-taken, and appellant's third assignment of error is overruled.
In its fourth assignment of error, appellant maintains that the ERAC should have determined that the District was not "duly authorized" to service the Saddlebrook development. Appellant bases this argument on its claim that the District is "statutorily prohibited" from providing water to the Saddlebrook development, as that development lies outside of the District's defined water service area. However, appellant fails to direct this court's attention to any authority for the proposition that either the OEPA or the ERAC is authorized to settle disputes over an entity's service territory. Finally, a regional water and sewer district is an independent political subdivision pursuant to R.C. Chapter 6119, and pursuant to R.C. 6119.06(G) may "[a]quire, construct, reconstruct, enlarge, improve, furnish, equip, maintain, repair, operate, lease or rent to or from, or contract for operation by or for, a political subdivision or person, water resource projects within or without the district." (Emphasis added.) As such, appellant's fourth assignment of error is overruled.
Having overruled all four of appellant's assignments of error, we hereby affirm the ERAC's November 9, 2000 findings of fact, conclusions of law, and final order as being supported as relevant by reliable, probative, and substantial evidence in accordance with R.C. 3745.06.
Order affirmed.
TYACK and DESHLER, JJ., concur.