NESTLE R&D CENTER, INC., APPELLANT, *v*. LEVIN, TAX COMMR., APPELLEE.

[Cite as *Nestle R&D Ctr., Inc. v. Levin,*

**122 Ohio St.3d 22, 2009-Ohio-1929.]**

*Taxation — Franchise tax — Tax credit for creating new jobs — R.C. 122.17 and 5733.0610 — Statute of limitations — Three-year limitations period in R.C. 5733.12(B) begins to run when Department of Development issues certificate verifying the amount of credit.*

(No. 2008-1285 — Submitted April 21, 2009 — Decided April 30, 2009.)

APPEAL from the Board of Tax Appeals, No. 2006-M-1365.

_____

**Per Curiam.**

**{¶ 1}** This case presents a statute-of-limitations question. When a corporate franchise taxpayer claims a tax credit for creating new jobs in Ohio, it does so by filing a refund claim under R.C. 5733.12(B). This case asks when the three-year limitations period for filing such a claim begins to run. The Tax Commissioner and the Board of Tax Appeals ("BTA") held that the limitations period began to run at the time taxes were deemed to have been paid. Nestle argues that the period began to run at a later time: the date on which the Department of Development issued the certificate that verifies the amount of the tax credit.

**{¶ 2}** We hold that the three-year limitations period commences to run when the Department of Development issues the certificate. We therefore reverse the BTA's decision and remand for further proceedings.

## I. Facts

### A. *Procedural history*

{¶ 3}   Appellant Nestle R&D Center, Inc. ("Nestle") initiated the present proceedings by filing an application for a refund of corporation franchise tax for tax year 2001.  The substantive basis for the claim lies in the refundable credit for Ohio job creation provided by R.C. 122.17 and 5733.0610.  The Ohio Tax Credit Authority entered into a ten-year agreement to grant that tax break to Nestle in 1994, and the authority issued a certificate on December 6, 2004, that confirmed the amount of credit that Nestle could claim for tax year 2001.  Nestle then filed its refund application on January 6, 2005.

{¶ 4}   The Tax Commissioner found that Nestle had filed its application after the three-year limitations period provided by R.C. 5733.12(B) had expired.  Having determined that the application was untimely, the commissioner concluded that he lacked jurisdiction to consider it.  On appeal, the Board of Tax Appeals ("BTA") affirmed.

{¶ 5}   Before this court, Nestle renews its contention that the three-year statute of limitations set forth in R.C. 5733.12(B) does not bar its refund claim.  Nestle argues that the limitations period did not begin to run until it received the certificate allowing the job credit for tax year 2001, which did not occur until December 6, 2004.

### B.  *The job-creation tax credit*

{¶ 6}   Enacted in 1992, Sub.S.B. No. 363 provided tax breaks designed to encourage job creation by businesses in Ohio.  144 Ohio Laws, Part II, 2642.  The act originally provided a credit against the corporation franchise tax and the personal income tax.  The enabling provisions are codified at R.C. 122.17.

{¶ 7}   The credit becomes available through a formal agreement between the taxpayer and the Ohio Tax Credit Authority, a panel chaired by the Director of Development that consists of four other members selected by the governor and legislative leaders.  R.C. 122.17(C), (D), and (M).  The basis for computing the credit lies in the amount of income-tax withholding associated with employees

who hold the newly created jobs, and the taxpayer negotiates the percentage of withholding to be used in computing the credit as one term of the tax-credit agreement. R.C. 122.17(A)(3) and (D)(4).

**{¶ 8}** It is significant that the job-creation tax credit is refundable in nature. R.C. 122.17(B); 5733.0610(A). That means that the taxpayer receives the full benefit of the credit even if it does not have sufficient liability to offset in a given tax year. See *Sorenson v. Secy. of the Treasury* (1986), 475 U.S. 851, 854, 106 S.Ct. 1600, 89 L.Ed.2d 855 (unlike other credits that can be used "only to offset tax that would otherwise be owed," the federal earned-income credit is refundable, meaning that if an individual's earned-income credit exceeds his tax liability, the excess amount is considered an overpayment of tax to be refunded to the taxpayer); R.C. 5733.0610(A) ("taxes equal to the amount of the refundable credit shall be considered to be paid to this state on the first day of the tax year"); cf. R.C. 5733.98(A)(31) and 5733.98(B) (distinguishing refundable credits such as the job-creation credit from those for which "the amount of the credit for a tax year shall not exceed the tax due after allowing for any other credit that precedes it in the order required under this section"). Thus, when the amount of the job-creation tax credit exceeds the tax liability as to a particular year, the state first applies the excess against other debts the taxpayer owes to the state, and then disburses any remaining excess to the taxpayer as a refund payment. R.C. 5733.121.

*C. The grounds for dismissal by the Tax Commissioner and the BTA*

**{¶ 9}** The record is not extensively developed in this case, but it does contain four Ohio Tax Credit Authority certificates that pertain to taxable years 2000 through 2003. Each of the certificates refers to the underlying agreement between Nestle and the authority: the agreement was entered into on April 20, 2004, and extended from January 1995 to December 2004. For each year in the

record, the certificate allowed a credit in the amount of 60 percent of the income-tax withholding attributable to newly created jobs during the taxable year. [1]

{¶ 10} R.C. 5733.12(B) states that an application for a refund of franchise tax shall be filed "within three years from the date of the illegal, erroneous, or excessive payment of the tax." The statute further clarifies that a payment made before the franchise tax return was due "shall be deemed to have been made on the due date or extended due date." The Tax Commissioner applied R.C. 5733.12(B) to Nestle's refund claim and found that the claim was untimely.

{¶ 11} The commissioner predicated his dismissal on the timing of the "payment" under R.C. 5733.12(B). For taxable year 2000, Nestle obtained an extension for its federal income tax return to September 17, 2001, which automatically extended Nestle's Ohio franchise-tax filing deadline for tax year 2001 to October 15, 2001. See R.C. 5733.13 (Ohio extended due date falls on the 15th day of the month following the federal extended due date). Since Nestle's payments for tax year 2001 consisted either of previously tendered estimated payments or carry-forward from a previous year, the commissioner determined that the three-year limitations period commenced on October 15, 2001. The commissioner focused on that date because, pursuant to R.C. 5733.12(B), that date was the extended due date to which those earlier payments related. As a result, the commissioner concluded that the deadline for Nestle to claim a refund for tax year 2001 fell on October 15, 2004. Under the commissioner's reading of the statute, the filing of a refund claim after that date would be time-barred.

{¶ 12} On December 6, 2004, the Department of Development issued the certificate verifying the amount of credit for the 2000 taxable year, i.e., for

---

1. The corporation franchise "tax year" liability is determined, under the net-income method, by reference to a preceding "taxable year" during which the income was generated. See *LSDHC Corp. v. Zaino*, 98 Ohio St.3d 450, 2003-Ohio-1911, 786 N.E.2d 877, ¶ 17. Accordingly, the certificate applicable to the 2001 tax year is the certificate that is captioned "taxable year ended 2000."

franchise tax year 2001. That agency computed the 2001 credit to be $43,696.80, which is 60 percent of the new-employee withholding. Nestle thereafter filed its application for refund on January 6, 2005, asking for a refund in the amount of $43,697.

{¶ 13} The commissioner ruled that the application was untimely because it was filed more than three years after October 15, 2001, and he dismissed the application. For its part, Nestle argued that it had timely filed its application because the certificate that authorized the credit for the 2001 tax year was issued by the Department of Development on December 6, 2004, and in Nestle's view, that event triggered the running of the three-year limitations period.

{¶ 14} On appeal, the BTA rejected Nestle's argument, and adopted the Tax Commissioner's position that the three-year limitations period began when the tax payments as to 2001 were deemed to have been made: October 15, 2001. As a result, Nestle filed its application too late, and the BTA accordingly affirmed the commissioner's dismissal.

{¶ 15} In its appeal to the court, Nestle renews the arguments that it asserted below.

## II. Analysis

### A. *The accrual of the refund claim started the running of R.C. 5733.12(B)'s limitations period*

{¶ 16} Under our cases, " '[t]he BTA is responsible for determining factual issues and, if the record contains reliable and probative support,' " the court will affirm. *Satullo v. Wilkins*, 111 Ohio St.3d 399, 2006-Ohio-5856, 856 N.E.2d 954, ¶ 14, quoting *Am. Natl. Can Co. v. Tracy* (1995), 72 Ohio St.3d 150, 152, 648 N.E.2d 483. On the other hand, the court " 'will not hesitate to reverse a BTA decision that is based on an incorrect legal conclusion.' " *Satullo*, id., quoting *Gahanna-Jefferson Local School Dist. Bd. of Edn. v. Zaino* (2001), 93 Ohio St.3d 231, 232, 754 N.E.2d 789. This appeal raises a question of law: with

respect to the job-creation tax credit at issue, did the three-year limitation period prescribed by R.C. 5733.12(B) commence with the deemed payment of taxes in 2001 or with the issuance of the certificate that legally verified the amount of the credit to be allowed for tax year 2001?

{¶ 17} R.C. 5733.12(B) provides as follows:

{¶ 18} "[A]n application to refund * * * the amount of taxes * * * that are overpaid, paid illegally or erroneously, or paid on any illegal, erroneous, or excessive assessment * * * shall be filed with the tax commissioner, on the form prescribed by the commissioner, within three years from the date of the illegal, erroneous, or excessive payment of the tax * * *. For purposes of division (B) of this section, any payment that the applicant made before the due date or extended due date for filing the report to which the payment relates shall be deemed to have been made on the due date or extended due date."

{¶ 19} According to the commissioner, the statute's plain language starts the running of the three-year period at the time the payment is made (or, as in the present case, was deemed to have been made). Nestle argues that when the payments in this case were deemed to be made, they were not yet illegal or excessive; they *became* illegal and excessive *retroactively* when the Department of Development issued the certificate for taxable year 2000, which verifies the amount of credit for tax year 2001. Alternatively, by verifying the credit for tax year 2001, the certificate allowed the taxpayer and the state to ascertain the entitlement to the credit for the first time in December 2004.

{¶ 20} In sum, Nestle contends in various ways that the refund claim accrued on December 6, 2004, and that the limitations period began running on that date. Under this interpretation, the filing of Nestle's application for refund the following month fell well within the three-year period.

{¶ 21} We agree with Nestle. R.C. 5733.12(B) in essence creates a refund claim subject to a three-year limitations period. See *Coca-Cola Bottling Corp. v.*

6

*Lindley* (1978), 54 Ohio St.2d 1, 5, 8 O.O.3d 1, 374 N.E.2d 400, fn. 2 (R.C. 5733.12 "provide[s] a substantive right—the right to a refund"). Entitlement to the refund is predicated on two elements: first, that a payment was made; second, that the payment was illegal, erroneous, or excessive. Because the taxpayer must prove the illegal, erroneous, or excessive character of a payment in order to qualify for a refund, a refund claim does not accrue until all circumstances are present that cause the payment to be illegal, erroneous, or excessive. See *Ohio Bell Tel. Co. v. Evatt* (1943), 142 Ohio St. 254, 258, 27 O.O. 201, 51 N.E.2d 718; accord *Velotta v. Leo Petronzio Landscaping, Inc.* (1982), 69 Ohio St.2d 376, 23 O.O.3d 346, 433 N.E.2d 147, paragraph two of the syllabus (cause of action for negligence does not arise until damage ensues); *State ex rel. Teamsters Local Union 377 v. Youngstown* (1977), 50 Ohio St.2d 200, 203-204, 4 O.O.3d 387, 364 N.E.2d 18 ("Normally, a cause of action does not accrue until such time as the infringement of a right arises").

{¶ 22} In *Ohio Bell*, we addressed a claim that public-utility excise taxes already paid should be abated. Several years after the tax payments at issue, the Public Utilities Commission ruled that the rates Ohio Bell charged during those earlier years had been excessive, and the commission ordered Ohio Bell to make restitution to customers. Because Ohio Bell had paid excise taxes on the amount it was being ordered to refund to its customers, the company sought an abatement of those taxes. Ohio Bell pursued that claim through a provision of the former General Code that is now codified at R.C. 5703.05(B).

{¶ 23} R.C. 5703.05(B) furnishes a procedure for a taxpayer to receive a "certificate of abatement" when taxes have been overpaid, but only if the overpayment occurred "within five years prior to the making of [the] application." At the time relevant to the *Ohio Bell* decision, the statute allowed an application by a party "claiming to have overpaid * * * within five years prior to the making of [the] application but not prior to January 1, 1938." G.C. 1464-3, 118 Ohio

Laws 346. Ohio Bell applied for the abatement *less than* five years after the Public Utilities Commission had ordered the utility to make restitution to its customers, but the commissioner denied relief because Ohio Bell actually tendered the payments before January 1, 1938 (and also more than five years before Ohio Bell filed its application).

{¶ 24} In rejecting the commissioner's position, we noted that "[t]here was nothing illegal or erroneous about the payment of taxes when originally made," and that payment "became illegal or erroneous only when the Public Utilities Commission made its order of refund." Id., 142 Ohio St. at 258, 51 N.E.2d 718. We concluded that "the overpayment took place on that date [i.e., the date of the PUCO order] and came within the time fixed by law." Id.

{¶ 25} To be sure, in *Coca-Cola*, 54 Ohio St.2d 1, 8 O.O.3d 1, 374 N.E.2d 400, we distinguished *Ohio Bell* by observing that unlike the statute at issue in *Ohio Bell*, R.C. 5733.12 (at that time) "clearly mandate[d] a three-year deadline and state[d] that the deadline controls regardless of the date of ascertainment [that the payment was illegal]." *Coca-Cola* at 5. Thus, in *Coca-Cola* we had "no cause to construe the statute liberally in favor of the taxpayer as we did in Ohio Bell." Id. But we are free to apply *Ohio Bell* to the present case because the distinction we drew in *Coca-Cola* evaporated in 1985. That year, the General Assembly removed the ascertainment language from R.C. 5733.12(B) and rewrote the statute so that it now resembles the language at issue in *Ohio Bell*. S.B. No. 127, 116th General Assembly, 141 Ohio Laws, Part I, 334. As a result, *Coca-Cola* does not diminish the significance of *Ohio Bell* for analyzing the present case under current R.C. 5733.12(B).

{¶ 26} Applying the reasoning of *Ohio Bell* to this case requires us to consider when the payments at issue became illegal and excessive under R.C. 5733.12(B). The agreement between Nestle and the Department of Development is not part of the record, but its important terms are evidenced by the certificates.

We infer that the agreement entitled Nestle each year to a refundable credit in the amount of 60 percent of the income-tax withholding associated with newly created jobs. Neither R.C. 122.17 nor 5733.0610 states in so many words whether the credit may be claimed *before* the Department of Development has issued the certificate verifying the exact amount of credit for a particular tax year, but the statutes do plainly make such verification an essential element of the process. R.C. 122.17(D)(7). We note that the BTA did not hold, nor does the Tax Commissioner argue, that the existence of the agreement by itself creates entitlement to the credit for any particular tax year.

{¶ 27} In fact, the language of the statutes supports Nestle's argument. As discussed, R.C. 122.17 requires a formal agreement between the taxpayer and the Ohio Tax Credit Authority. Under R.C. 122.17(D)(7), the agreement must require the Department of Development to "verify the amounts reported" by the taxpayer and "issue a certificate to the taxpayer stating that the amounts have been verified." In addition, R.C. 122.17(H) required – at the time relevant to this case – that a "taxpayer claiming a credit under this section shall submit to the tax commissioner a copy of the director of development's certificate of verification under division (D)(7) of this section for the taxable year," and went on to state that "failure to submit a copy of the certificate does not invalidate a claim for a credit."[2]   147 Ohio Laws, Part I, 985.

{¶ 28} R.C. 5733.0610(A) states that a refundable credit "granted by the tax credit authority under section 122.17 of the Revised Code may be claimed under this chapter." Taken together, the language of the various provisions

---

2. In a provision effective March 30, 2006, the 126th General Assembly amended this part of the statute to require that the submission be made "with the taxpayer's tax report or return for the taxable year." The failure to attach the certificate did not invalidate the claim, so long as the taxpayer submitted it to the commissioner "within sixty days after the commissioner * * * requests it." 2006 Am.Sub.H.B. No. 530. The addition of the filing-with-return requirement could alter the analysis in this opinion, but because the language was enacted after the period at issue, we decline to consider it.

indicates the legislative intent that (1) the taxpayer will typically "claim" the credit *after* it has been "granted," and (2) the issuance of the certificate completes the "grant" of the credit – a construction that allows the taxpayer to comply with the requirement of former R.C. 122.17(H) that the certificate be submitted when the taxpayer claims the credit.[3]

{¶ 29} To the extent that the statutes in effect in 2001 and 2004 were ambiguous on the point, the principle of strict construction dictates that the verification certificate be construed as a prerequisite to claiming the credit. Quite simply, the jobs credit constitutes a partial tax exemption, with the result that the statutes granting the credit must be construed restrictively against the claim of exemption. See *H.R. Options, Inc. v. Wilkins*, 102 Ohio St.3d 1214, 2004-Ohio-2085, 807 N.E.2d 363, ¶ 2 (exclusion from taxation must be "construed *strictly against* the taxpayer" [emphasis sic]); *Ares, Inc. v. Limbach* (1990), 51 Ohio St.3d 102, 104, 554 N.E.2d 1310 (when seeking tax reduction, taxpayer must show that statute "clearly express[es] the exemption"). This principle applies a fortiori in a case like the present, because the credit in this case is refundable and the taxpayer may be entitled to a cash payout from the state that exceeds the amount of tax paid in.

{¶ 30} We conclude that just as the PUCO order retroactively established that the excise-tax payments in *Ohio Bell* had been illegal and excessive, the issuance on December 6, 2004, of the certificate for taxable year 2000

---

3. In the 2005 budget bill, the General Assembly extended the credit to insurance companies that pay taxes on gross premiums. 2005 Am.Sub.H.B. No. 66. In connection with that amendment, the legislature added claiming provisions to the gross-premium tax laws. See R.C. 5725.32; 5729.032. Both those provisions explicitly state that the credit may be claimed "[u]pon the issuance of a tax credit certificate by the director of development." Had these provisions been enacted originally as part of the same session law with R.C. 5733.0610, principles of construction would militate toward finding that the legislature intended to create different procedures by using different words. But we construe the additional language of the more recent provisions as simply stating what the earlier provisions already intended, albeit with greater directness.

retroactively established the illegal and excessive character of payments attributable to the tax year 2001 up to the amount of the credit (and also that the taxpayer would be entitled to collect the excess of credit over payments, if any). At that point, the refund claim accrued for purposes of the limitations period, and as a result, the filing of the refund claim in January 2005 was timely.

*B. The cases the Tax Commissioner relies on are not apposite*

{¶ 31} The Tax Commissioner argues that *Coca-Cola*, 54 Ohio St.2d at 5, 8 O.O.3d 1, 374 N.E.2d 400, controls the present case. According to the commissioner, *Coca-Cola* establishes that refund claims under R.C. 5733.12(B) are always subject to a limitations period that begins to run with the making (or deemed making) of a payment. We disagree.

{¶ 32} As already discussed, entitlement to a refund under R.C. 5733.12(B) is predicated on two elements: (1) the making of a payment that (2) was illegal, erroneous, or excessive. In the usual case, a payment is refundable because it was illegal or in error at the time the payment is made. This mistake could consist of a factual error by the taxpayer in marshaling its assets or computing its income, or it could result from a misunderstanding of the law.

{¶ 33} *Coca-Cola* itself falls into this usual category. In that case, the corporate taxpayers had paid for the tax year 1972 under the income method for computing franchise-tax liability, which the legislature had newly enacted during 1971. In 1975, this court decided that imposing the income method in tax year 1972 on taxpayers whose accounting year had already ended before the income method became law violated the Ohio Constitution. *Lakengren, Inc. v. Kosydar* (1975), 44 Ohio St.2d 199, 73 O.O.2d 502, 339 N.E.2d 814. In response to *Lakengren*, the taxpayers in *Coca-Cola* filed refund claims, but this court held that the refund claims were barred by the three-year limitation set forth in R.C. 5733.12(B).

**{¶ 34}** Given these underlying facts, *Coca-Cola* does not resolve the issue presented by Nestle in this case because the taxpayers in *Coca-Cola* paid the tax in compliance with a law that was, *at the very time the payments were made*, unconstitutional. Thus, illegality clearly coincided with the payments in *Coca-Cola,* and as a result, *Coca-Cola* does not on its face foreclose Nestle's argument in this case.

**{¶ 35}** Moreover, *Coca-Cola* did not involve a taxpayer seeking the benefit of a *refundable* credit. To the extent that such a credit exceeds the amount of actual payments that have been made, there has been no "payment," and as a result, there is no absolute point of reference to tell the taxpayer when to file its refund claim. *Coca-Cola*'s iron link between the running of the three-year limitations period and an actual past payment does not provide direct authority for deciding the present case.

**{¶ 36}** The commissioner also places heavy reliance on *SCM Chems., Inc. v. Wilkins*, 106 Ohio St.3d 43, 2005-Ohio-3676, 831 N.E.2d 417, but that case does not advance his claim. Quite simply, the issue the court confronted in *SCM Chems.* differed from the one presented in this case. In the present case, Nestle and the Tax Commissioner dispute when the three-year limitations period under R.C. 5733.12(B) began to run. There was no such dispute in *SCM Chems.*

**{¶ 37}** In *SCM Chems.*, the taxpayer pointed to a provision in the substantive law of pollution-control certificates that made those certificates effective retroactively. The taxpayer then argued that when a pollution-control certificate was issued after the two-year period for amending property tax assessments had expired pursuant to R.C. 5711.25, the court should ignore the two-year limitation. The court disagreed and enforced the limitation. Nothing in the *SCM* holding addresses when the three-year limitations period ought to begin to run in this case.

*C. Ohio Adm.Code 122:7-1-06(E) does not alter the outcome*

**{¶ 38}** Although neither party has cited it, Ohio Adm.Code 122:7-1-06(E) potentially applies to this case. Subsection (E) was added in 2003 and became effective November 10, 2003. 2003-2004 Ohio Monthly Record 833-834. As a result of that amendment, Ohio Adm.Code 122:7-1-06(E) now provides that the Director of Development should not issue a verification certificate if a taxpayer "has not substantiated to the satisfaction of the director the amounts reported by the taxpayer * * * by the date the refund statute of limitations expires for that taxable year, as provided in division (B) of section 5733.12 * * * of the Revised Code."[4]

**{¶ 39}** We recognize that this provision views the limitations period as running from some time before the verification certificate has been issued. But concern for the viability of the rule cannot distract us from our duty to construe and apply the statutes that were in force when this case arose.

**{¶ 40}** To be sure, R.C. 122.17(I) confers authority upon the Director of Development (in consultation with the commissioner and the Superintendent of Insurance) to "adopt rules necessary to implement" the tax credit. As a general matter, "an administrative rule that is issued pursuant to statutory authority has the force of law unless it is unreasonable or conflicts with a statute covering the same subject matter." *State ex rel. Celebrezze v. Natl. Lime & Stone Co.* (1994), 68 Ohio St.3d 377, 382, 627 N.E.2d 538, citing *Youngstown Sheet & Tube Co. v. Lindley* (1988), 38 Ohio St.3d 232, 234, 527 N.E.2d 828. But while R.C.

---

4. The rule's effective date precedes the issuance of the verification certificate on December 6, 2004. We presume that the rule would apply and, to the extent our holding in this case does not completely eclipse the rule, it would have prohibited the Department of Development from issuing the verification certificate if Nestle had not timely submitted documentation. Moreover, since the record is silent, we must also presume that the Director of Development found that Nestle had timely submitted its documentation so that the issuance of the certificate was valid. See *State ex rel. Shafer v. Ohio Turnpike Comm.* (1953), 159 Ohio St. 581, 590, 50 O.O. 465, 113 N.E.2d 14 ("in the absence of evidence to the contrary, public officers * * * will be presumed to have properly performed their duties and not to have acted illegally but regularly and in a lawful manner").

122.17(I) surely confers authority on the Department of Development to establish reasonable deadlines for submitting documentation, we do not read that provision as authorizing the Director of Development to provide the definitive construction of R.C. 5733.12(B).[5]   See *Adams Fruit Co., Inc. v. Barrett* (1990), 494 U.S. 638, 649, 110 S.Ct. 1384, 108 L.Ed.2d 585 (no deference to agency's regulation where Congress did not delegate administrative authority over the statutory provisions at issue); *Ardestani v. Immigration & Naturalization Serv.* (1991), 502 U.S. 129, 148, 112 S.Ct. 515, 116 L.Ed.2d 496.

### III.  Conclusion

**{¶ 41}** For all the foregoing reasons, the BTA erred when it affirmed the commissioner's dismissal of Nestle's refund claim.  We therefore reverse and remand for further proceedings.

Decision reversed

and cause remanded.

MOYER, C.J., and PFEIFER, LUNDBERG STRATTON, O'CONNOR, O'DONNELL, LANZINGER, and CUPP, JJ., concur.

_____

Vorys, Sater, Seymour & Pease, L.L.P., Raymond D. Anderson, and David A. Froling, for appellant.

Richard Cordray, Attorney General, and Sherry Maxfield and Alan P. Schwepe, Assistant Attorneys General, for appellee.

_____

5. We presume that the Director of Development consulted with the Tax Commissioner when the rule was promulgated, and the commissioner *is* charged with administering R.C. 5733.12(B) and other refund provisions.  But the commissioner has not apprised the court of his role in that putative consultation; indeed, the commissioner has not even cited the rule in spite of the fact that it arguably applies to this case and arguably supports his position.  Under these circumstances, we attach no significance to any consultation under R.C. 122.17(I).