MARALGATE, L.L.C., APPELLEE, *v*. GREENE COUNTY BOARD OF

REVISION ET AL., APPELLANTS.

[Cite as *Maralgate, L.L.C. v. Greene Cty. Bd. of Revision,*

130 Ohio St.3d 316, 2011-Ohio-5448.]

*Real property taxation—Valuation for current agricultural use—Transfer of part of property to related entity—Common ownership and contiguity of parcels—R.C. 5713.30(A)—Noncommercial timber.*

(No. 2010-1769—Submitted October 18, 2011—Decided October 26, 2011.)

APPEAL from the Board of Tax Appeals, No. 2008-M-644.

_____

**Per Curiam.**

{¶ 1}  This is an appeal by the Greene County auditor and the Greene County Board of Revision ("BOR") from a decision of the Board of Tax Appeals ("BTA") that reversed the decision of the BOR and granted current-agricultural-use-valuation ("CAUV") status to a 70.959-acre parcel owned by Maralgate, L.L.C.  The parcel was purchased by the Turner Family Partnership as part of a 749-acre farm in March 2005.  Apparently, the entire farm enjoyed CAUV status until the parcel at issue was transferred from the family partnership to the Maralgate entity on July 28, 2006.  Thereafter, the Greene County auditor denied the CAUV application for tax year 2007, and Maralgate filed a complaint with the BOR, which held a hearing and denied the application.  Maralgate then filed an appeal to the BTA, which held a hearing of its own and issued a decision reversing the BOR and granting the CAUV status.  The county has appealed.

{¶ 2}  Central to all the county's arguments is its contention that because of the transfer of the one parcel from Turner Family Partnership to Maralgate, the tax status of that parcel had to be determined in isolation, without regard to the

use of adjacent parcels still directly owned by the partnership. Because almost 60 percent of the parcel has trees that are not grown for commercial purposes, the most important consideration is whether the parcel was, for purposes of R.C. 5713.30(A)(1), under "common ownership" with the rest of the farm.

{¶ 3} We hold that the parcel was under common ownership with the rest of the farm. Guided by that central holding, we reject two additional arguments advanced by the county. First, contrary to the county's assertion, the phrase "growth of timber for a noncommercial purpose" in R.C. 5713.30(A)(1) does not require that the trees in question be grown as a crop. Second, the county is mistaken when it contends that Maralgate could receive the tax preference only for that portion of the parcel that was being actively cultivated; as a result, Maralgate did not have the burden to present a land survey showing how much of the parcel was devoted to different uses. Contrary to the county's argument, the case law requires such a survey only if there is a *commercial* use of part of a parcel that is not an agricultural use. In the present case, those portions of the parcel not actively cultivated were not used for any commercial purpose.

{¶ 4} Because we reject the arguments advanced by the appellants, we affirm the decision of the BTA.

## I. Facts

{¶ 5} In March 2005, the Turner Family Partnership acquired a 749-acre farm consisting of more than one parcel in a single transaction. One component of that farm was the 70.959-acre parcel that is at issue. In July 2006, the partnership assigned that parcel to Maralgate, L.L.C., in order to limit liability in case of a drowning in one of the quarry ponds on the property.

{¶ 6} Because of the change of ownership, the auditor declined to treat the parcel as part of the larger farm. Instead, she reviewed the application solely in light of the uses of the parcel itself. Pursuant to that review, the auditor and

2

subsequently the BOR determined that the parcel did not qualify for CAUV treatment for 2007.

{¶ 7} Maralgate appealed to the BTA, which held a hearing on October 15, 2009. At that hearing, Maralgate offered the testimony of Albert J. Turner III, a principal and the general partner of the Turner Family Partnership.

{¶ 8} Turner testified that the partnership acquired the "Noble Farm," a 749-acre tract that included the property at issue, through auction in February 2005. In July 2006, the partnership transferred the parcel to Maralgate for liability reasons relating to the ponds. Maralgate is a single-member limited-liability company wholly owned by the Turner Family Partnership.

{¶ 9} Turner himself farmed the larger farm, including the parcel at issue, and testified that the cultivation involved the field crops soybeans and corn. Turner stated that there were about 20 acres of "agricultural land" on the parcel. But he amended that testimony to 19.7310 based on reviewing the property record card, which sets forth "tillable," "woodland," and "right of way" acreage. As for the portion of the parcel actually under cultivation, approximately 2.2 acres were farmed in the northwest corner of the parcel, and Turner's testimony indicated (with very little precision) that additional land in the eastern and southeastern part of the parcel had been cleared and farmed. Turner additionally testified that the parcel generated at least $2,500 per year.

{¶ 10} The record does not contain Maralgate's 2007 CAUV application, but at the BOR hearing, the auditor explained her grounds for denying the preferred tax status: "[Y]ou have to [actually farm] at least 25 percent [of the parcel] * * * and you are not meeting the 25 percent for farming purposes" as to the parcel. As for the integration of the parcel into the whole 749-acre farm, the auditor stated her position that "[e]ven though it's owned by the same family it's not the same name" and that as a result of the partnership having "transferred it into an LLC," the parcel's tax status must be determined in isolation from the

remainder of the farm. The BOR denied Maralgate's complaint on the grounds of "no documentation provided and no proof of income."

{¶ 11} After Maralgate appealed to the BTA, the board held a hearing at which it reviewed an aerial photograph of the parcel and heard testimony of Turner. The BTA issued its decision on September 21, 2010.[1] The BTA first found that "the property, as a part of the larger farm, had been continuously farmed during the relevant time period." (Sept. 21, 2010), BTA No. 2008-M-644, at 6. Second, the BTA cited an earlier decision for the proposition that in R.C. 5713.30(A)'s reference to exclusive agricultural use, "exclusively" means "primarily."[2] In this context, the BTA acknowledged the BOR's view that because "a single parcel of land may be divided into separate economic units, all or some of which may qualify for CAUV and others of which may not," the property owner should "specify the boundaries of the economic units." Id. at 7. But the BTA rejected the application of that doctrine in the present case on the grounds that the parcel "has not been divided into separate *economic* units," inasmuch as "[n]o income, other than farm income, devolves from any portion of the property." (Emphasis sic.) Id. The BTA determined that the wooded portion of the parcel enjoyed the preferred tax status because it was under common ownership with the surrounding Turner Family Partnership parcels pursuant to

---

1. At page 8 of its decision, the BTA notes that "the tillable land * * * comprises 19 acres," and on page 9, the BTA states that "[t]he 19-20 acres that have been and continue to be planted each year are also entitled to CAUV status." The county points out that land determined to be suited for agricultural use is not necessarily under actual cultivation. To the extent that there is any factual mistake on the BTA's part, however, it is inconsequential: the BTA predicated its decision on considering the parcel as part of the 749-acre farm, and the county does not claim that the agricultural use is insubstantial in relation to the entire farm.

2. The county contends that the BTA erred by stating that exclusive use under R.C. 5713.30(A) means primary use. The county is correct to the extent that any *commercial* use of a portion of a parcel that is not agricultural will defeat the claimant's right to obtain CAUV status, at least as to that nonagricultural portion. But as discussed below, the BTA's decision does not fall into error, because the BTA correctly distinguished the incidental uses in this case as noncommercial and found that they did not defeat the CAUV claim.

R.C. 5713.30(A)(1). Id. at 7-8. The BTA also found that the portion of the parcel that was being tilled should enjoy CAUV status and declined to require detachment of the other portions of the parcel. Id. at 8. Accordingly, the BTA reversed the BOR's denial of CAUV status and ordered that it be granted.

{¶ 12} The BOR and the auditor have appealed, and we now affirm.

## II. Analysis

{¶ 13} By a 1973 amendment to the state Constitution, Ohio voters authorized the General Assembly to depart from uniformity in valuing real property by permitting farms to be valued in accordance with their current agricultural use rather than their market value. Section 36, Article II, Ohio Constitution; 1973 House Joint Resolution 13, 135 Ohio Laws, Part I, 2043; see *Fife v. Greene Cty. Bd. of Revision*, 120 Ohio St.3d 442, 2008-Ohio-6786, 900 N.E.2d 177, ¶ 3. "Under the authorizing amendment and the implementing statutes, 'the auditor disregards the highest and best use of the property and values the property according to its current agricultural use,' a procedure that 'usually results in a lower valuation and a lower real property tax.' " Id., ¶ 4, quoting *Renner v. Tuscarawas Cty. Bd. of Revision* (1991), 59 Ohio St.3d 142, 143, 572 N.E.2d 56.

{¶ 14} The implementing legislation is set forth at R.C. 5713.30 et seq. Central to the resolution of the case before us is the definition of "land devoted exclusively to agricultural use" at R.C. 5713.30(A). Division (A)(1) offers a definition applicable to "[t]racts, lots, or parcels of land totaling not less than ten acres," while division (A)(2) states a definition applicable to tracts of less than ten acres. Because we affirm the BTA's grant of CAUV status under division (A)(1), we do not reach and do not address the applicability of division (A)(2).

**A. The parcel is under "common ownership" with the 749-acre Turner family farm because the family partnership owns Maralgate**

{¶ 15} Under R.C. 5713.30(A)(1), "[t]racts, lots, or parcels of land" qualify for CAUV treatment to the extent that during the requisite period, they are "devoted exclusively to commercial animal or poultry husbandry, aquaculture, apiculture, the production for a commercial purpose of timber, field crops, tobacco, fruits, vegetables, nursery stock, ornamental trees, sod, or flowers." Additionally, the statute provides that tracts, lots, or parcels devoted exclusively to the "growth of timber for a noncommercial purpose" may qualify "if the land on which the timber is grown is contiguous to or part of a parcel of land under common ownership that is otherwise devoted exclusively to agricultural use."[3] We hold that to the extent that it is wooded, the parcel qualifies for CAUV status under R.C. 5713.30(A)(1).

{¶ 16} Three uses of property described in division (A)(1) occurred on the parcel. First, field crops were cultivated on approximately three acres in the northwest corner of the parcel and an indeterminate portion in the south and east of the parcel. Second, a portion of the parcel is covered with ponds that are vestiges of earlier quarrying conducted on the parcel, while another portion is devoted to a landfill that the owner permits the county to use without charge.

{¶ 17} Third and most significantly, more than 40 of the 70 acres of the parcel were wooded, but the trees were not cultivated as a crop. Thus, the stand of trees covered some 57 percent of the parcel, and its presence raises the question whether the parcel constitutes land "contiguous to or part of a parcel of land under common ownership that is otherwise devoted exclusively to agricultural use" for purposes of R.C. 5713.30(A)(1).

---

3. A stand of noncommercial timber may also qualify as part of a federal land-retirement or conservation program, but that provision is not at issue here.

6

**{¶ 18}** The county contends that the parcel cannot be treated as part of the larger farm under R.C. 5713.30(A)(1) because Maralgate is not identical to the Turner Family Partnership, i.e., it is a different entity that owns the property. The county cites an administrative rule of the tax commissioner that defines "[t]racts, lots, or parcels" as "all distinct portions or pieces of land (not necessarily contiguous) where the title is held by *one owner, as listed on the tax list and duplicate of the county*, which are actively farmed as a unit if together the total acreage meets the requirements of section 5713.30(A)(1) or (A)(2), of the Revised Code." (Emphasis added.) Ohio Adm.Code 5703-25-30(B)(25). That rule plainly contemplates an identity of owners. Contrary to the county's contention, however, the rule does not apply to the situation before us.

**{¶ 19}** As noted, the relevant statutory language is in R.C. 5713.30(A)(1): land devoted to "the growth of timber for a noncommercial purpose" may qualify for CAUV status if it is contiguous to and under common ownership with land that is otherwise devoted to agricultural use. The applicable statutory language is "common ownership," which connotes a wider scope than that contemplated by the administrative rule. Different corporate entities—such as Turner Family Partnership and Maralgate—are said to be under common ownership when they are parent and subsidiary, or when they each have the same members or shareholders. See, e.g., *Union Bldg. & Constr. Corp. v. Bowers* (1958), 110 Ohio App. 81, 86-87, 12 O.O.2d 254, 158 N.E.2d 386 (fact of "common ownership" of the two parties to a transaction did not avoid sales-tax obligation where the sales-tax vendor was a wholly owned subsidiary of the sales-tax purchaser).

**{¶ 20}** The county argues that the tax commissioner's rule, which requires the same entity to be listed as owner of the different parcels, controls the scope of "common ownership" under R.C. 5713.30(A)(1). We disagree.[4]

---

4. We recognize that requiring parcels to be titled to the very same owner has the substantial advantage of making the common ownership immediately evident to the auditor. That

**{¶ 21}** It is elemental that an administrative rule such as Ohio Adm.Code 5703-25-30 is " 'designed to accomplish the ends sought by the legislation enacted by the General Assembly,' " and an administrative rule " 'does not conflict with a statute to the extent that it provides a reasonable, supportable interpretation of it.' " *Rich's Dept. Stores, Inc. v. Levin*, 125 Ohio St.3d 15, 2010-Ohio-957, 925 N.E.2d 951, ¶ 17, quoting *Hoffman v. State Med. Bd. of Ohio*, 113 Ohio St.3d 376, 2007-Ohio-2201, 865 N.E.2d 1259, ¶ 17, and *Chicago Pacific Corp. v. Limbach* (1992), 65 Ohio St.3d 432, 435, 605 N.E.2d 8. Moreover, " 'an administrative rule that is issued pursuant to statutory authority has the force of law unless it is unreasonable or conflicts with a statute covering the same subject matter.' " *Nestle R&D Ctr., Inc. v. Levin*, 122 Ohio St.3d 22, 2009-Ohio-1929, 907 N.E.2d 714, ¶ 40, quoting *State ex rel. Celebrezze v. Natl. Lime & Stone Co.* (1994), 68 Ohio St.3d 377, 382, 627 N.E.2d 538.

**{¶ 22}** R.C. 5715.29 authorizes the tax commissioner to prescribe rules concerning "the exercise of the powers and the discharge of the duties" of the auditor in relation to "the assessment of property and the levy * * * of taxes." As R.C. 5713.31 acknowledges, this authority extends to prescribing rules for valuing land that has been determined to be "devoted exclusively to agricultural use." Moreover, the authority by its terms encompasses the eligibility of land for CAUV. Thus, the administrative rules at issue fall generally within a grant of rule-making authority to the commissioner.

**{¶ 23}** Nonetheless, we do not read Ohio Adm.Code 5703-25-30(B)(25) as imposing the same-owner limitation on the language of R.C. 5713.30(A)(1). The main reason is that the reference to "common ownership" was enacted into R.C. 5713.30(A)(1) many years after the administrative rule was promulgated.

---

consideration is not decisive, however, given that the board of revision proceedings pursuant to R.C. 5715.19 permit the introduction of evidence of common ownership when the owners are not identical.

See *Castillo v. Jackson* (1992), 149 Ill.2d 165, 178, 171 Ill.Dec. 471, 594 N.E.2d 323 (attaching little interpretative significance to a Labor Department program letter because the letter was promulgated "well before" the passage of the relevant statute).

{¶ 24} Specifically, the text that is currently the tax commissioner's rule at Ohio Adm.Code 5703-25-30 was originally a BTA rule promulgated in 1973 that was codified in the Ohio Administrative Code on November 11, 1977, as a rule of the former commissioner of tax equalization at Ohio Adm.Code 5705-5-01. 1977 Ohio Monthly Record 3-652. Subsequently, the rules codified at Ohio Adm.Code Title 5705 were recodified as Chapter 5703-25, at which time the language became part of current Ohio Adm.Code 5703-25-30. 2003-2004 Ohio Monthly Record 784, 795.

{¶ 25} Meanwhile, the General Assembly amended R.C. 5713.30(A) twice in a manner pertinent to the issue before us. See *Dircksen v. Greene Cty. Bd. of Revision*, 109 Ohio St.3d 470, 2006-Ohio-2990, 849 N.E.2d 20, ¶ 16-21 (discussing the history of R.C. 5713.30(A)). Originally, the statute listed timber among the agricultural products that, when cultivated for commercial purposes, could qualify land for the preferred tax treatment. Am.Sub.S.B. No. 423, 135 Ohio Laws, Part II, 341, 344. Effective March 1993, the legislature removed division (A)(1)'s reference to timber produced for commercial purposes and substituted a provision that qualified timber "whether or not it is produced for a commercial purpose." 1992 Sub.H.B. No. 95, 144 Ohio Laws, Part II, 2994, 3001. Later in 1993, the statute was amended again so as to read as it currently does—namely, land devoted to commercial timber production qualifies as well as land devoted to "growth of timber for a noncommercial purpose, if the land on which the timber is grown is contiguous to or part of a parcel of land under common ownership that is otherwise devoted exclusively to agricultural use." 1993 Am.Sub.H.B. No. 281, 145 Ohio Laws, Part III, 5281. Thus, the reference

to "common ownership" did not become part of the statute until almost 20 years after the original promulgation of the rule.

{¶ 26} Because the rule was promulgated long before the statutory language at issue was enacted, we do not view the rule as an administrative construction of that language. Moreover, a rule that would require the same entity to be the owner of two parcels is arguably inconsistent with the statutory requirement that land be under "common ownership," as already indicated. Simply put, the latter term indicates that once the information is in their possession, the taxing authorities should look behind the person or entity named on a deed to determine the ultimate ownership of two properties.

{¶ 27} For the foregoing reasons, we reject the county's contention that Ohio Adm.Code 5703-25-30(B)(25) forecloses consideration of the parcel in conjunction with the contiguous Turner family parcels.

### B. R.C. 5713.30(A)(1) explicitly allows the tax preference for noncommercial timber based on contiguity and common ownership

{¶ 28} The county argues that noncommercial timber under R.C. 5713.30(A)(1) must still constitute a "crop" in order to qualify the wooded area of the parcel for the tax preference. We disagree. As already discussed, the history of R.C. 5713.30(A)(1)'s reference to timber demonstrates that the county is mistaken. See *Dircksen*, 109 Ohio St.3d 470, 2006-Ohio-2990, 849 N.E.2d 20, ¶ 20-21. Originally, the statute referred to timber produced "for commercial purposes." Next, the statute was amended to include timber whether or not grown for a commercial purpose. Finally, the current language limited the tax break for noncommercial timber by requiring contiguity and common ownership.

{¶ 29} This sequence of amendments shows that the General Assembly intended to permit the tax break to apply to the wooded portions of a farm even if the timber in those areas was not harvested as a crop. The county's citation of *Rocky Fork Hunt & Country Club v. Testa* (1995), 100 Ohio App.3d 570, 654

N.E.2d 429, is unavailing. In that case, the parties disputed whether the wooded portion of a parcel was devoted exclusively to agricultural use in 1992, *before the 1993 amendments* that permitted noncommercial timber to qualify for the tax preference. Thus, the Tenth District's decision simply did not address the provision of law at issue here, because it was not in effect at the time at issue in that case.

### C. Granting CAUV status is not unreasonable when a parcel is part of and under common ownership with a larger farm and has a sizeable wooded area but no commercial use other than agriculture

{¶ 30} Section 36, Article II of the Ohio Constitution authorizes the legislature to provide preferential tax treatment where land is "devoted exclusively to agricultural use." R.C. 5713.30(A) implements the constitutional authorization, setting forth when land is "devoted exclusively to agricultural use," and it does so by stating those agricultural uses that qualify for the tax preference.

{¶ 31} The county argues that the tax preference must be granted on an acre-by-acre basis and that the owner has the burden to demonstrate by land survey precisely which portions of any particular parcel are subject to agricultural use as defined. In support, the county cites *Renner*, 59 Ohio St.3d 142, 572 N.E.2d 56.

{¶ 32} In both *Renner* and the later case, *Furbay v. Tuscarawas Cty. Bd. of Revision* (1991), 61 Ohio St.3d 64, 572 N.E.2d 660, land that had previously qualified for CAUV treatment was subject to a conversion, i.e., a loss of CAUV status, pursuant to R.C. 5713.34. In each case, the owner had leased a portion of the parcel to another entity for mining. When called upon to render a recoupment of tax savings from earlier years, the owner in each case sought to reduce the amount of recoupment by arguing that only some, not all, of the land had been leased for a nonagricultural, commercial use.

**{¶ 33}** The court held that an owner may reduce the amount of recoupment by proving that a portion of the land continued to enjoy CAUV status. But the court placed the burden firmly on the owner to demonstrate, by land survey if necessary, the precise area devoted to agricultural and nonagricultural use. Absent such proof, the recoupment must equal the tax savings that relate to the entire parcel.

**{¶ 34}** In this case, the BTA correctly concluded that *Renner* and *Furbay* are not apposite. What was different in *Renner* and *Furbay* was the existence of a new *commercial* use of the property that was not agricultural. Simply put, *Renner* and *Furbay* underscore the proposition that when a portion of a parcel of real estate is used for a commercial purpose that is not agricultural, the parcel itself cannot be said to be "devoted exclusively to agricultural use." It follows that if an owner nonetheless desires to qualify some portion of the parcel that is still subject to the agricultural use, the owner must show precisely what acreage is agricultural and what acreage is subject to the other commercial use. But as the BTA stated, the doctrine of *Renner* and *Furbay* does not apply here, because there is no *commercial* use other than the agricultural. BTA No. 2008-M-644, at 7 (the noncommercial uses of the parcel did not involve "economic units" that had to be excluded from CAUV status).

**{¶ 35}** The county also points to an administrative rule of the tax commissioner to support its position. In particular, the rule requires that "[o]ne acre for each residence on a parcel shall be valued as a homesite in the same manner as similar homesites in the area *on a market value basis*." (Emphasis added.) Ohio Adm.Code 5703-25-34(I). On the basis of this pronouncement, the county infers that "[w]hat applies to a homesite would, of course, equally apply to a landfill or an abandoned quarry, none of which are used for an agricultural purpose." In other words, the county postulates that *any* acreage not directly

farmed must be separated and subjected to market valuation, even if it has no separate commercial use.

{¶ 36} We disagree. The administrative rule expressly creates a one-acre carve-out for the farm home but remains silent on other uses incidental to agricultural use. Contrary to the county's reasoning, we construe the rule's silence on other uses—such as the vestigial quarry ponds and the county's permissive and noncommercial use of a corner of the parcel as a landfill—as *not* requiring a carve-out. The conditions are merely that such uses be purely incidental to the overall agricultural use and that they not be commercial in nature.

{¶ 37} In sum, the present case involves a 749-acre farm consisting of contiguous parcels and, with respect to the parcel at issue, only one commercial use—the growing of field crops, which is agricultural under R.C. 5713.30(A). As discussed, there are about 40 acres of noncommercial timber on the parcel, and they qualify for tax preference by virtue of their contiguity and common ownership with the farm. With regard to the entire 749-acre tract (that being the relevant unit), the county does not contend that agricultural use is insubstantial. All that remains is at most 27 acres of the quarry ponds along with the area that Maralgate allows the county to use, free of charge, as a landfill. This area constitutes a mere 3.6 percent of the area of the entire Turner farm, and nothing in the record suggests that its use is anything other than incidental to the farm as a whole.

{¶ 38} Under all these circumstances, we conclude that the BTA acted reasonably and lawfully when it granted CAUV status to the entire parcel. We therefore affirm the BTA's decision.

## Conclusion

{¶ 39} For the reasons set forth, the decision of the BTA is reasonable and lawful. We therefore affirm it.

Decision affirmed.

O'CONNOR, C.J., and PFEIFER, LUNDBERG STRATTON, O'DONNELL, LANZINGER, CUPP, and MCGEE BROWN, JJ., concur.

_____

Rogers & Greenberg, L.L.P., James G. Kordik, and David M. Pixley, for appellee.

James R. Gorry, for appellants.

_____